774 F.2d 909
 MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Appellee,
v.
FIRST NATIONAL BANK OF LITTLE ROCK, ARKANSAS, Appellant.
Comex, Inc.; Comex Charge Systems, Inc.; Comex Livestock
Investment Systems, Inc.; Consolidated Holding Co.;
Consolidated Collection Management, Inc.; Consolidated
Charge System, Inc., d/b/a Comex, Inc.; and Bridgeport Company.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Appellee,
Worthen Bank & Trust Co., Appellant,
FIRST NATIONAL BANK OF LITTLE ROCK, ARKANSAS, Comex, Inc.,
Comex Charge Systems, Comex Livestock Investment Systems,
Inc., Consolidated Holding Co., Consolidated Collection
Management, Inc., Consolidated Charge System, Inc., d/b/a
Comex, Inc., Bridgeport Company and Dwight L. Pierce, Appellees.
 Nos. 84-2107, 84-2156.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 9, 1985.
Decided Oct. 10, 1985.
 
 Herschel H. Friday and V. Markham Lester, Little Rock, Ark., for appellant.
 Priscilla Karen Pope, Fayetteville, Ark., for appellee.
 Before BRIGHT, Senior Circuit Judge, ARNOLD and FAGG, Circuit Judges.
 ARNOLD, Circuit Judge.
 
 
 1
 This case arises out of a check-kiting scheme perpetrated by a group of businesses known collectively as Comex, Inc., which operated a collection service for doctors' accounts receivable. Comex had accounts with Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), First National Bank of Little RockB, Worthen Bank and Trust Co., N.A. (Worthen), and Bank of New York (BONY). Merrill Lynch acted in a dual capacity. It had an account as a customer with FNB. It also behaved substantially as a bank in that it maintained for Comex, among many other customers, an account known as the Ready Assets Trust, through which customers could earn interest through the purchase of Ready Assets Shares. The customer could redeem these shares for cash through a "share redemption request," which for most practical purposes had the same characteristics as an ordinary bank check. Share redemption requests were presented for payment at BONY from the Merrill Lynch account maintained there. A major advantage of the Ready Assets Trust was that it allowed customers to earn money on "float." Float refers to the period (usually two to seven days) between the drawing of a check and its ultimate collection by presentment to the drawee bank. Merrill Lynch facilitated exploitation of the float by giving immediate credit on deposits by customers such as Comex of uncollected items into its Merrill Lynch account.
 
 
 2
 The kiting scheme involved Comex's artificially inflating its balance in the Merrill Lynch Ready Assets Trust. For example, Comex would deposit with Merrill Lynch checks drawn on its account with FNB even though at that time Comex might not have had sufficient funds in that bank to cover its checks. Since Merrill Lynch chose to give immediate credit on deposits, Comex would earn money through the Ready Assets Trust on money which did not exist. Eventually, of course, Comex would have to cover its withdrawal from its account at FNB and would deposit with FNB checks drawn on another bank, for instance Worthen. Then Comex would cover its deficit at Worthen with checks drawn on other accounts including, perhaps, the interest-bearing account at Merrill Lynch. Comex was able to keep this scheme in motion for approximately one year before the kite was discovered and collapsed through the actions of FNB. The resulting loss to all financial institutions involved totalled in excess of two million dollars.
 
 
 3
 Specifically, this case involves banking transactions among Merrill Lynch, FNB, Worthen, and Comex that occurred on April 11 and 12, 1983. At some point during the course of these dealings, FNB became aware that certain checks drawn on Worthen by Comex, and deposited by Comex in Merrill Lynch's account at FNB, were being dishonored by Worthen and returned to FNB. The result of the return of these items, of course, had to be that FNB would charge them back against Merrill Lynch's account with it. But FNB (contrary, Merrill Lynch says, to its customary practice) did not promptly inform Merrill Lynch, its depositor, that this charge-back was occurring. If it had been promptly informed, Merrill Lynch says, it would have known of Comex's kiting scheme and could have protected itself against loss by not paying FNB for certain other checks drawn by Comex. FNB's major objection to this theory of recovery, as we shall see, is that the evidence before the jury was not sufficient to support it.
 
 
 4
 Merrill Lynch brought this suit in the District Court[1] for the Eastern District of Arkansas against Comex; various directors of Comex; the chief executive officer of Comex, Dwight Pierce; and the First National Bank. In an action transferred from bankruptcy court, Worthen Bank asserted claims against FNB and Comex. After a jury trial, Merrill Lynch received judgment for $1,207,580 against FNB, Dwight Pierce, and Comex, jointly and severally. The actions against the directors were voluntarily dismissed. Worthen received judgment against FNB for $394,220 and against Comex for $827,948.73. FNB was awarded indemnity against Comex for the full amount of the judgment in favor of Merrill Lynch.
 
 
 5
 Comex, which is now in bankruptcy, did not appeal the judgment of the District Court. Dwight Pierce gave notice of an appeal but failed to prosecute his appeal, which is dismissed. 8th Cir.R. 13. First National Bank appeals the denial of its motions for directed verdict and for judgment notwithstanding the verdict. Worthen appeals only from that part of the judgment and order which held FNB to be jointly and severally liable to Merrill Lynch. We modify the portion of the District Court judgment awarding FNB complete indemnity against Comex, and affirm in all other respects.
 
 I.
 
 6
 FNB raises two points in its appeal.[2] First, it asserts that the verdict was contrary to prevailing law. Second, it argues that there was insufficient evidence to support the verdict of the jury.
 
 A. The Bank's Duty to its Customer
 
 7
 Merrill Lynch's theory of recovery is based on the common-law tort of deceit. It alleged and sought to prove that FNB deliberately failed to inform Merrill Lynch that over one million dollars in bad checks had been returned from Worthen and were to be charged to Merrill Lynch's account. It sought to prove that a previous, established course of dealing existed between Merrill Lynch and FNB by which FNB consistently informed Merrill Lynch of large-item returns when they were received, and that Merrill Lynch justifiably relied on the bank's so informing it. Merrill Lynch alleged that FNB deliberately chose to delay informing it of these large return items so that the bank could protect its own assets by collecting on other checks which had been drawn on Merrill Lynch by its customer, Comex.
 
 
 8
 At trial FNB relied mainly on the theory that FNB had no duty to Merrill Lynch or other financial institutions to discover the existence of a check-kiting scheme and then surrender the benefit of its diligence by disclosing the kite before acting to protect itself.
 
 
 9
 FNB also sought to prove that Merrill Lynch was negligent in allowing its customer Comex to inflate the value of its Ready Assets Trust balance by giving immediate credit on Comex deposits, and that Merrill Lynch was in an equal or better position to discover the scheme but had exempted Comex from its in-house kite-detection routines. FNB's reliance on what is essentially a contributory-negligence defense is misplaced, for the central question in this case is not whether FNB or Merrill Lynch had a duty to the other to discover and disclose the check-kiting scheme as such. Rather, Merrill Lynch alleged, and FNB failed to refute, that FNB departed from its established course of dealing with Merrill Lynch in order to shift the ultimate loss to Merrill Lynch. Since FNB did not attempt to prove that Merrill Lynch was negligent in relying on FNB's policy of prompt notification when large charge-back items came in, the question of contributory negligence is irrelevant to the outcome of this case.[3]
 
 
 10
 First National Bank does not object to the District Court's instructions on the elements of deceit,[4] which essentially follow Arkansas law. The Arkansas Supreme Court in Beam v. Monsanto Co., 259 Ark. 253, 264, 532 S.W.2d 175, 180-81 (1976), adopted Dean Prosser's five-element definition of the tort of deceit, as follows:
 
 
 11
 1. A false representation made by the defendant. In the ordinary case this representation must be one of fact.
 
 
 12
 2. Knowledge or belief on the part of the defendant that the representation is false--or, what is regarded as equivalent, that he has not a sufficient basis of information to make it. This element is often given the technical name of 'scienter.'
 
 
 13
 3. An intention to induce the plaintiff to act or refrain from action in reliance upon the misrepresentation.
 
 
 14
 4. Justifiable reliance upon the misrepresentation on the part of the plaintiff, in taking action or refraining from it.
 
 
 15
 5. Damage to the plaintiff, resulting from such reliance.
 
 
 16
 W. Prosser, Law of Torts 685-86 (4th ed. 1971). See also MFA Mut. Ins. Co. v. Keller, 274 Ark. 281, 623 S.W.2d 841 (1981); Storthz v. Commercial Nat. Bank, 276 Ark. 10, 631 S.W.2d 613 (1982). Neither does the bank challenge the instruction on misrepresentation by failure to act.[5] When a fact is peculiarly within the knowledge of one party and of such a nature that the other party is justified in assuming the existence of that fact, then there is a duty to disclose the fact. Bridges v. United Savings Association, 246 Ark. 221, 228, 438 S.W.2d 303, 306 (1969). Justifiable reliance of this sort may arise through the course of dealing between the bank and its customer. See City National Bank v. McCann, 193 Ark. 967, 972-73, 106 S.W.2d 195, 199 (1937). The duty to speak may be based on special circumstances, such as a confidential relationship, in which one party knows that another is relying on a misrepresentation to his detriment. Berkeley Pump Co. v. Reed-Joseph Land Co., 279 Ark. 384, 397, 653 S.W.2d 128, 134 (1983). The relationship inducing reliance need not be a fiduciary one in a strict sense; the surrounding circumstances may reveal reliance even though the parties are not in a confidential relationship. Camp v. First Fed'l Savings & Loan, 12 Ark.App. 150, 154, 671 S.W.2d 213, 216 (1984).
 
 
 17
 To all this FNB does not object. Instead, it relies on case law which addresses the duty of a bank to disclose a check kite to another bank. See, e.g., Mid-Cal Nat'l Bank v. Federal Reserve Bank of San Francisco, 590 F.2d 761 (9th Cir.1979); Citizen's National Bank v. First National Bank, 347 So.2d 964 (Miss.1977). While these cases may correctly state the law as to dealings between banks when both have equal opportunity to discover a check-kiting scheme, they do not stand for the proposition that a bank may act unilaterally to shift the resulting loss onto a depositor who is relying on the bank's policy of giving prompt notice of checks to be charged back to its account. The District Court correctly ruled that FNB, if it had committed itself to a course of dealing with its customer, was not entitled to depart from that course of dealing in order to take advantage of superior knowledge.
 
 B. Sufficiency of the Evidence
 
 18
 We turn now to FNB's contention, pressed at oral argument, that there was insufficient evidence from which the jury could have found that FNB had committed a fraud upon Merrill Lynch. We preface our remarks with a brief chronology of the events and transactions which gave rise to the dispute between Merrill Lynch and FNB. Three groups of checks are involved.
 
 
 19
 The first group, totalling $638,650, were checks drawn on BONY (that is, on Merrill Lynch's Ready Assets account maintained at BONY) by Comex and deposited by Comex into its own account with FNB. FNB sent these checks through normal banking channels for collection at BONY. They were returned by BONY unpaid and reached FNB around noon on 11 April 1983. FNB suspected from an examination of its records that a check kite might be in progress. It responded as follows: it called Comex and demanded "good funds." At about the same time, FNB froze the Comex account, preventing payment of any further drafts on that account. It then located deposits into that account made on 11 April, and by 4:30 p.m. on that day had decided to send a bank representative to New York to present these items personally to BONY for payment. At about 4:00 p.m. on 11 April, a Comex employee arrived with a check drawn on Merrill Lynch in the amount of $638,650. The check was dated 12 April. FNB processed the check after hours on 11 April and sent it for presentment.
 
 
 20
 The second group of checks totalled $568,930. These were the deposits placed by Comex into its FNB account on 11 April. As described above, they had been located by FNB employees after the check kite was suspected and a freeze had been placed on the Comex account. These items were drawn on BONY. At around 4:30 on 11 April, FNB decided to send a representative to New York to present these items. This procedure would allow FNB to receive good money the next day, rather than waiting for the normal bank clearing process, which would take at least two days. On 12 April, the FNB representative presented the items to BONY. BONY called Merrill Lynch and was assured that Comex had an adequate account with it. BONY sent the funds by wire. The money was received by FNB at 3:43 local time on 12 April. These two groups of checks together amounted to $1,207,580, the amount of the jury's verdict.
 
 
 21
 The third group of checks, totalling over 1.2 million dollars, was drawn by Comex on its account with Worthen Bank and deposited 7 April in Merrill Lynch's account at FNB. (Merrill Lynch allowed Comex to deposit checks directly in its, Merrill Lynch's account, and then to draw on those funds as if they had already been collected.) These checks had been presented through normal bank clearing channels. Worthen Bank dishonored the checks for insufficient funds and returned them to FNB on the afternoon of 11 April. The parties are at odds over when FNB actually knew of the return items from Worthen which would ultimately be charged back to Merrill Lynch. The evidence is clear, however, that FNB did not attempt to inform Merrill Lynch of these items until late on the afternoon of 12 April. Actual notification did not take place until the first two groups of checks had been paid from Merrill Lynch funds at the Bank of New York. The evidence showed that Merrill Lynch, had it known that Comex deposits into Merrill Lynch's account were no good, would not have honored Comex's request for a $638,650 draft on 11 April, and would have frozen Comex's Ready Assets Trust account at the Bank of New York, preventing payment of the $568,930 on 12 April. It is crucial to Merrill Lynch's case that it prove that FNB knew on 11 April, before it collected on the first two groups of checks, that Merrill Lynch was the payee on the 1.2 million dollars of Comex checks returned from Worthen Bank. Merrill Lynch contends, and the trial court agreed, that there was sufficient evidence in the record for a jury to find in its favor on this critical point. FNB vehemently disagrees.
 
 
 22
 When ruling on a motion for directed verdict, the court must view the evidence, together with all reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. A motion for directed verdict is properly denied when the evidence presented allows reasonable people in a fair exercise of their judgment to draw a different conclusion. Giordano v. Lee, 434 F.2d 1227, 1231 (8th Cir.1970), cert. denied, 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971). In other words, a verdict may be directed only when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party. Id. See also Halladay v. Verschoor, 381 F.2d 100, 114 (8th Cir.1967).
 
 
 23
 We have interpreted the instruction to view the evidence favorably to the nonmovant as requiring the court to (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions to be drawn.
 
 
 24
 Dace v. ACF Industries, Inc., 722 F.2d 374, 375 (8th Cir.), modified per curiam, 728 F.2d 976 (8th Cir.1984). It is not for the court to weigh the evidence or to assess the quality of the evidence when ruling on a motion for directed verdict. That is a jury function. That the judge happens to disagree with the verdict or to disbelieve the nonmoving party's evidence is not sufficient reason to take the case from the jury. As this Court stated in Dace, supra,
 
 
 25
 Occasionally verdicts may be returned with which judges strongly disagree. This is a price, we think, worth paying for the jury system, which is enshrined in the Bill of Rights and sanctified by centuries of history. When questions of fact are involved, common sense is usually more important than technical knowledge, and twelve heads are better than one.
 
 
 26
 722 F.2d at 376-77.
 
 
 27
 Applying this standard to the evidence in the record, we find that it is undisputed that the Worthen items were returned to FNB on the afternoon of 11 April. There is some evidence from which the jury could have found that employees of FNB knew as early as 2:00 p.m. on 11 April that the return items were coming back from Worthen Bank and that at least "some of them" were to be charged back to Merrill Lynch. (See rebuttal testimony of Jerry Oates, Tr. 518-523.) This was at least one and one-half hours before the first check for $638,650 was delivered to cover the Comex overdraft. There was testimony from which the jury could have concluded that FNB was not only aware of the items to be charged back to Merrill Lynch, but consciously decided to delay notification of Merrill Lynch until after FNB had collected on all outstanding Comex checks (direct testimony of Charles Cook, Tr. 379-383). There is also the rebuttal testimony of Mr. Oates (Tr. 523) that although he would under normal circumstances have notified Merrill Lynch of the returned items on the day that they were received, in this instance he did not, but instead deferred to his superiors in the bank because "they were handling the thing." It is undisputed that Merrill Lynch was not actually informed of the returned items from Worthen Bank until after FNB received the wire of $568,930 on 12 April. Although a dispassionate observer after the fact may have an opinion as to the relative weight of this evidence, it cannot be said that there was no evidence from which a reasonable jury could have found for Merrill Lynch. We affirm the ruling of the District Court.
 
 II.
 
 28
 Worthen Bank appeals the order of the District Court making FNB and Comex jointly and severally liable to Merrill Lynch. Worthen had asserted a claim against Comex in the Bankruptcy Court; its claim was transferred to the District Court upon the demand of intervenor Merrill Lynch for a jury trial on that issue. Worthen's interest in the order here appealed from stems from the possibility that valuable assets may remain in the Comex bankruptcy estate; if FNB is entitled to indemnity from Comex (the apparent result of the order), Worthen's share as an unsecured creditor will be reduced.
 
 
 29
 Worthen argues that FNB and Comex cannot be jointly and severally liable because they committed separate and distinct torts of deceit against Merrill Lynch. Worthen relies on an oftrepeated statement in Arkansas decisions that "all who actively participate in any manner in the commission of a tort, or who command, direct, advise, encourage, aid or abet its commission, are jointly and severally liable." See, e.g., Hinton v. Bryant, 236 Ark. 577, 582, 367 S.W.2d 442, 444 (1963). Worthen asserts that since FNB and Comex did not act together in bringing about each other's torts, they cannot be jointly and severally liable for Merrill Lynch's loss. However, the statement quoted above, while accurate as to situations in which multiple tortfeasors engage in concerted action resulting in harm to another, does not speak the whole Arkansas law on the subject. In Russell v. Pryor, 264 Ark. 45, 568 S.W.2d 918 (1978), it was held that "parties need not act in concert to be liable as joint tortfeasors." Id. at 53, 568 S.W.2d at 922. This rule encompasses situations in which separate, independent acts concur in causing an indivisible single harm to the plaintiff. For example, in Woodward v. Blythe, 249 Ark. 793, 462 S.W.2d 205 (1971), one defendant negligently parked his automobile partly on the pavement. The plaintiff, seeking to avoid the parked car, struck an oncoming vehicle and was then in turn struck by a vehicle negligently driven by the second defendant. The Arkansas court held that both defendants were jointly and severally liable for the injuries suffered by the plaintiff, even though their tortious acts occurred at different times and were related only to the extent that they converged in a single injury to the plaintiff. The court went on to say that it was unnecessary for the plaintiff to apportion the harm between the two tortfeasors by attempting to prove the precise quantum of damage proximately caused by each, so long as the fault of each tortfeasor was a substantial factor in causing the result. 249 Ark. at 799, 462 S.W.2d at 209.
 
 
 30
 It is the law of some jurisdictions, but evidently not Arkansas, that separate torts which are severable in time (successive torts) may not give rise to joint and several liability. See, e.g., Lasprogata v. Qualls, 263 Pa.Super. 174, 397 A.2d 803 (1979). In Arkansas, successive torts may result in joint and several liability when they result in a single injury. In the medical-malpractice case of Applegate v. Riggall, 229 Ark. 773, 318 S.W.2d 596 (1958), the plaintiff alleged that Applegate, a physician, negligently performed an operation. Subsequently, Riggall performed additional surgery to correct the problems resulting from Applegate's negligence. The plaintiff sued Applegate for the entire loss. In allowing Applegate to pursue his third-party claim against Riggall for contribution, the court stated that while tortfeasors, acting independently, are jointly liable only when their independent acts contribute to the same injury, it is not necessary that the tortious acts be committed at the same time or that they converge at the same instant. If one tortfeasor is sued for a loss which is partly the fault of another, then he is entitled to contribution or indemnity, as the case may be. 229 Ark. at 776-77, 318 S.W.2d at 598. See also Southwestern Gas & Elec. Co. v. Godfrey, 178 Ark. 103, 10 S.W.2d 894 (1928).
 
 
 31
 We hold that the District Court correctly found FNB and Comex to be jointly and severally liable for the single loss sustained by Merrill Lynch.
 
 
 32
 It does not necessarily follow, however, that FNB, as a joint tortfeasor, is entitled to judgment over against Comex for the entire amount of the judgment for which it is liable to Merrill Lynch. In Arkansas, "the doctrine of indemnity is based upon the equitable principles of restitution which permit one who is compelled to pay money, which in justice ought to be paid by another, to recover the sums so paid unless the payor is barred by the wrongful nature of his own conduct." Larson Machine, Inc. v. Wallace, 268 Ark. 192, 213-14, 600 S.W.2d 1, 12 (1980). Although it is true that there can be no indemnity without a duty between the tortfeasors, either agreed upon by contract or imposed by the court through quasi-contract, the right to indemnity depends as well upon the nature and quality of the wrong done to the injured party.
 
 
 33
 The Restatement (Second) of Torts Sec. 886B(1) (1977) sets out the general rule of indemnity as follows: "If two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both, he is entitled to indemnity from the other if the other would be unjustly enriched at his expense by the discharge of the liability." Section 886B(2)[6] gives examples of typical indemnity situations. In all of these situations, the indemnitee is liable as a matter of law but the loss is primarily caused by the indemnitor, not the indemnitee. Courts have used a number of expressions to explain the underlying principle of indemnity, sometimes perhaps producing more confusion than clarification. It has been said that when defendants are in pari delicto indemnity is inappropriate. Distinctions, oft-times strained, have been drawn between "active" and "passive" tortfeasors and between "primary" and "secondary" fault or conduct. See W. Prosser and W. Keeton, Law of Torts 341-345 (5th ed. 1984). In Arkansas various formulae have been applied by the courts, but we discern at least three recurring situations (aside from express contract indemnity) in which the doctrine has been applied.
 
 
 34
 First, there are situations in which a party is liable not because of his own malfeasance or neglect (the "active fault" of the cases) but rather because of his legal relationship with the party whose act or dereliction proximately caused the harm.[7] These are cases in which the law has seen fit to impute liability to the party most likely to be able to compensate in full the injured party, but has through the doctrine of indemnity allowed the financially responsible party to recover what it can from the party ultimately at fault. The Arkansas cases make clear that the right of indemnity in this instance cannot exist when the party seeking indemnity has proximately caused the harm.[8]
 
 
 35
 A second category of indemnity case, rare in Arkansas is the converse of the first. This is the case of the obedient servant or agent who is found liable for injuries caused by his acting in good-faith reliance on the directions or authority of the master or principal, or who otherwise is put to loss as a result of actions within the scope of his agency. The law allows the loss ultimately to be laid upon the principal who gave the authority and direction. See, e.g., Southern Farm Bureau Casualty Insurance Company v. Gooding, 263 Ark. 435, 565 S.W.2d 421 (1978).
 
 
 36
 The third type of indemnity case is characterized by breaches of different duties owed by the tortfeasors to the injured party. Product-liability actions and defective-premises cases give us most of the case law in this area.[9] In the typical case of this kind the supplier of a defective product is found liable to the injured consumer (on a strict-liability or warranty theory) but is allowed indemnity from the manufacturer of the product apparently on the ground that that manufacturer's negligence in producing a defective product is more direct and palpable than the supplier's failure to discover the defect. As in the case of imputed liability, the justification for indemnity disappears if the supplier was himself proximately at fault for failing to inform the consumer of a known defect. Harrell Motors, Inc. v. Flanery, 272 Ark. 105, 612 S.W.2d 727 (1981).
 
 
 37
 We have not found any Arkansas cases in which an intentional tortfeasor was granted indemnity from another wrongdoer. Nor are we aware of any authority from other jurisdictions which would support such a result.
 
 
 38
 In the present case, it is true that but for Comex's wrongdoing there would have been no loss by the other parties. Comex was the drawer of the bad checks which precipitated FNB's subsequent actions. FNB could have, but did not, cross-claim against Comex for the amounts of the overdrafts on its account at FNB. Instead, FNB's claim against Comex, the only one it asserted at trial, was one for indemnity. It sought simply to shift to Comex the burden of its own liability to Merrill Lynch. While in the abstract such a result might seem just, in view of Comex's role in the affair, the law of indemnity in Arkansas does not merely look for duty and breach of duty between tortfeasors; it looks as well to the nature and quality of the wrong done to the injured party. When both defendants have intentionally wronged the plaintiff, neither of them is entitled to the benefit of the equitable doctrine of indemnity.
 
 
 39
 Here, Merrill Lynch would likely have suffered a much smaller loss had not FNB violated its duty to it. The trial court found that the purpose of FNB's actions was to avert the loss falling upon it from Comex's actions, and instead to make the loss fall upon its customer, Merrill Lynch. It can fairly be said that Merrill Lynch's loss was proximately caused by the intentional conduct of FNB. The doctrine of indemnity is not designed for cases such as this. It is an equitable doctrine and is available only to those who do equity.[10]
 
 
 40
 The Arkansas version of the Uniform Contribution Among Tortfeasors Act clearly provides that when liability is joint and several, a joint tortfeasor is not entitled to contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof. Ark.Stat.Ann. Sec. 34-1002(2). Since FNB did not ask the trial court to apportion the damages according to relative degrees of fault, as allowed by Sec. 1002(4), and the jury made no factual findings which would support such apportionment, FNB will be entitled to contribution from Comex for any amounts which it pays above one half of the judgment.
 
 
 41
 Insofar as the District Court awarded judgment to FNB for complete indemnity against Comex, the judgment is modified to provide for contribution in conformity with this opinion. In all other respects, we affirm.
 
 
 42
 BRIGHT, Senior Circuit Judge, concurring in part and dissenting in part.
 
 
 43
 I concur in Judge Arnold's excellent opinion sustaining the judgment in favor of Merrill Lynch against the FNB. I also agree that the judgment against FNB and Comex should be joint and several. I cannot agree, however, with the modification of the district court's judgment to deny FNB complete indemnity from Comex, which authored this financial fiasco through its check-kiting scheme.
 
 
 44
 The Arkansas Supreme Court has stated that " * * * the doctrine of indemnity is based upon the equitable principles of restitution which permit one who is compelled to pay money, which in justice ought to be paid by another, to recover sums so paid unless the payor is barred by the wrongful nature of his own conduct." Coleman v. Texaco, Inc., 286 Ark. 14, 16, 688 S.W.2d 741, 743 (1985) (quoting Larson Machine, Inc. v. Wallace, 268 Ark. 192, 600 S.W.2d 1 (1980)). The majority concludes that FNB cannot seek indemnity from Comex because FNB was an intentional tortfeasor as against Merrill Lynch, and therefore, is "barred by the wrongful nature of [its] own conduct." This conclusion misconstrues the equitable principles underlying the doctrine of indemnity as applied by Arkansas courts.
 
 
 45
 As observed by the Arkansas Supreme Court, the doctrine of indemnity rests on the concept of restitution, which regards a tort-feasor as unjustly enriched when another discharges liability that, in all justice, it should bear complete responsibility for paying. See Restatement (Second) of Torts Sec. 886B(1) and comment c (1977). Analysis of indemnity cases from Arkansas and other jurisdictions reveal that courts grant or deny indemnity based on the equities of each case.
 
 
 46
 The unexpressed premise [of these cases] has been that indemnity should be granted in any factual situation in which, as between the parties themselves, it is just and fair that the indemnitor should bear the total responsibility, rather than to leave it on the indemnitee or to divide it proportionately between the parties by contribution.
 
 
 47
 Restatement (Second) of Torts Sec. 886B comment c (1977); see also W. Prosser, Law of Torts 313 (4th ed. 1971).
 
 
 48
 The district court held that, as between FNB and Comex, it was fair and just for Comex to bear the burden of indemnifying FNB for all sums paid to Merrill Lynch. The facts more than amply support the district court's conclusion. By the time it detected Comex's kite, the FNB held an uncollected balance in its Comex account of over $1,000,000. By delaying notification to Merrill Lynch of the suspected kite, FNB allowed Comex to cover that amount with funds drawn on Merrill Lynch. The delay thus shifted the loss from FNB to Merrill Lynch, with this lawsuit shifting it back to FNB. At all times, however, Comex was obligated to make good the fraudulently issued (kited) checks that form the basis of this loss. For example, that the FNB incurred liability to Merrill Lynch does not change the obligation of Comex as the drawer of checks on a NSF (non-sufficient funds) account in the Worthen Bank. If FNB is not permitted complete indemnity from Comex, Comex will be unjustly enriched by being able to forever avoid paying in full for the benefits it received in perpetuating its fraud, and as so succinctly put by the district court, FNB "once again becomes the 'victim' of [Comex's] tortious conduct."
 
 
 49
 Therefore, the equitable principles of restitution that underlie the doctrine of indemnity in Arkansas demand that Comex indemnify FNB for all sums paid to Merrill Lynch. I would thus affirm the district court's decision granting indemnity in light of the clear absence of any abuse of discretion. Cf. Kapp v. Bob Sullivan Chevrolet Co., 234 Ark. 395, 353 S.W.2d 5, 9 (1962) (trial court's decision to grant contribution cannot be reversed absent an abuse of discretion).
 
 
 
 [1]
 The Hon. William R. Overton, United States District Judge for the Eastern District of Arkansas
 
 
 [2]
 FNB's brief also raised a question as to the appropriate burden of proof, alleging that the District Court should have instructed the jury that the elements of deceit must be proven by clear and convincing evidence. However, the recent case of Sellers v. West-Ark. Constr. Co., 283 Ark. 341, 676 S.W.2d 726 (1984), settles Arkansas law against FNB's position, and FNB has abandoned this point
 
 
 [3]
 It should be noted in passing that under the Arkansas Comparative Fault Statute (Ark.Stat.Ann. Sec. 27-1763 et seq.) it may be possible to plead comparative negligence in mitigation of the tort of deceit. See Woods, Comparative Fault Secs. 7.1 and 14.53 (1978). There are no Arkansas decisions on point. This Court will not raise and decide the issue sua sponte. In any event, all of the evidence that would have supported a theory of contributory negligence was before the jury in support of FNB's position that any reliance by Merrill Lynch was unreasonable. The jury's verdict necessarily rejected this position
 
 
 [4]
 The District Court charged the jury that it would have to find as follows in order to return a verdict against FNB:
 First ... that Merrill Lynch had a contractual relationship with First National Bank. Then there was, of course, one in this case; they have a bank deposit there; and had a reasonable belief that any representation made by First National Bank would be true.
 Second, that First National Bank knew of the contractual relationship and Merrill Lynch's reliance upon the truthfulness of representations made by First National Bank.
 Third, that First National Bank intentionally made false representations to Merrill Lynch which Merrill Lynch justifiably relied upon.
 And, fourth, that Merrill Lynch sustained damages as a proximate result of First National Bank's false representations and Merrill Lynch's reliance on those false representations.
 Tr. 580.
 
 
 [5]
 With respect to a definition of a false representation, a false representation by a party can be made by failure to state a material fact which, if known, would cause the other party to take action to prevent damages to itself
 In order to determine whether First National Bank was guilty of false representations, you may consider the course, the prior course of dealings between Merrill Lynch and First National Bank. An established course of conduct may be regarded as establishing a common basis of understanding between parties to a business relationship.
 Tr. 580-581.
 
 
 [6]
 Instances in which indemnity is granted under this principle include the following:
 (a) The indemnitee was liable only vicariously for the conduct of the indemnitor;
 (b) The indemnitee acted pursuant to directions of the indemnitor and reasonably believed the directions to be lawful;
 (c) The indemnitee was induced to act by a misrepresentation on the part of the indemnitor, upon which he justifiably relied;
 (d) The indemnitor supplied a defective chattel or performed defective work upon land or buildings as a result of which both were liable to the third person, and the indemnitee innocently or negligently failed to discover the defect;
 (e) The indemnitor created a dangerous condition of land or chattels as a result of which both were liable to the third person, and the indemnitee innocently or negligently failed to discover the defect;
 (f) The indemnitor was under a duty to the indemnitee to protect him against the liability to the third person.
 Restatement (Second) of Torts, Sec. 886B(2).
 
 
 [7]
 See, e.g., Transport Insurance Company v. Manufacturer's Casualty Insurance Company, 226 F.Supp. 251 (E.D.Ark.1964) (employee's negligence imputed to employer), aff'd sub nom. Pacific National Insurance Company v. Transport Insurance Company, 341 F.2d 514 (8th Cir.), cert. denied, 381 U.S. 912, 85 S.Ct. 1536, 14 L.Ed.2d 434 (1965)
 
 
 [8]
 For example, in Fidelity & Casualty Company of New York v. J.A. Jones Construction Company, 325 F.2d 605 (8th Cir.1963), architects who had been sued for injuries suffered by construction company employees when a wall caved in at the construction site sought indemnity from the construction company. Indemnity was denied when it was found that the architects had themselves been guilty of negligence which proximately caused the harm. We stated that "when parties have violated similar duties to the injured person, neither is entitled to indemnity." 325 F.2d at 611
 
 
 [9]
 In Dulin v. Circle F Industries, Inc., 558 F.2d 456 (8th Cir.1977), the court implied such a theory in dictum: "In the field of products liability the chain of indemnity ordinarily runs down the chain of distribution...." Id. at 464. See also Restatement (Second) of Torts, Sec. 886B(2)(d) and (e). Cf. Coleman v. Texaco, Inc., 286 Ark. 14, 688 S.W.2d 741 (1985) (sublessee compelled to pay for injuries resulting from defective premises could have indemnity if lessee was shown to have a duty to repair.)
 
 
 [10]
 Although it might be tempting for the Court to compare the relative intrinsic fault of the tortfeasors and apportion the damages accordingly, that is not the law of indemnity in Arkansas. Common-law indemnity continues to be an all-or-nothing remedy. However, most of the harshness said to be associated with such a stark rule has been ameliorated, in Arkansas as elsewhere, by passage of the Uniform Contribution Among Tortfeasors Act, which is codified at Ark.Stat.Ann. Secs. 34-1001 to 1009. Under that act, juries may determine proportional fault and award contribution pro rata according to the respective proportional fault of the parties. Ark.Stat.Ann. Sec. 34-1002(4)
 We note that the Arkansas Supreme Court recently declined the invitation to grant full indemnity when fault was unequal. Berkeley Pump Company v. Reed-Joseph Land Company, 279 Ark. 384, 653 S.W.2d 128 (1983). In that case, the jury had found one tortfeasor to be 10% at fault while the other was 90% at fault. The Court refused indemnity to the 10% tortfeasor, stating that since the fault of that party was "active," only contribution was appropriate. Id. at 401, 653 S.W.2d at 136.