UNITED STATES of America, Appellee,

v.

John A. KROH, Jr., Appellant.

No. 89–1070.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 11, 1989.
Decided March 2, 1990.

---

Darrell McGowen, Glen Ellyn, Ill., and Charles E. Atwell, Kansas City, Mo., for appellant.

Robert Larsen, Kansas City, Mo., for appellee.

Before LAY, Chief Judge, and BOWMAN and MAGILL, Circuit Judges.

LAY, Chief Judge.

John A. Kroh, Jr., appeals from his conviction on charges of defrauding three financial institutions. The indictment charged the defendant under count one with conspiracy to submit false statements to banks, 18 U.S.C. § 371 (1988); counts two through four with making false statements to banks, 18 U.S.C. § 1014 (1988); counts five through eight with causing interstate wire transmissions made in execution of a scheme to defraud, 18 U.S.C. § 1343 (1988); counts nine through twelve with causing the interstate transportation of money taken by fraud, 18 U.S.C. § 2314 (1988); count thirteen with knowingly receiving property that had crossed a state boundary after being unlawfully taken, 18 U.S.C. § 2315 (1988). Kroh was sentenced to the maximum term on each count, the longest of these being 10 years, with all sentences to run concurrently.

On appeal Kroh challenges the sufficiency of the evidence for each count, alleging the requisite intent was not established. Kroh also challenges evidentiary rulings of the district court[1] in admitting the guilty plea of his brother George Kroh as a co-conspirator; and admitting evidence pertaining to a check "kiting" scheme which was not charged. Upon full review of the record we find sufficient evidence to sustain Kroh's conviction except as to the charged conspiracy. We also find, however, in light of the insufficient evidence to sustain the conspiracy charge that George Kroh's guilty plea was inadmissible and constitutes prejudicial error. On this basis we vacate the judgment of conviction and remand to the district court for a new trial.

## BACKGROUND

Kroh Brothers Development Company (KBDC) was a Kansas City, Missouri, corporation which has been involved in commercial real estate development since 1969.

KBDC developed shopping centers and office buildings which were leased to third parties. The company stock was divided equally between John (Jack) Kroh, George Kroh, and the Kroh family trust. Jack was president of KBDC and George was the chairman and executive vice-president. The division of work between the two brothers gave George responsibility for the development and leasing of a piece of land, as well as obtaining limited partners to invest in developed property. Jack operated the financial end of the business by managing corporate finances, including long-term and short-term corporate debts. The evidence is undisputed that the brothers did not get involved in each other's sphere of responsibility.

Many of the investments made by limited partners in KBDC-developed property were tax shelters. In 1985–86 these investments lost their appeal because of an anticipated change in the tax laws. The company's cash flow became tight and the corporation found itself in financial difficulty. KBDC had previously experienced temporary cash shortages, as most of its profits were earned near the end of the calendar year. In the past, Jack and George obtained personal loans to help alleviate KBDC's temporary cash shortages. The proceeds of these loans were transferred from the brothers' personal accounts into corporate accounts.

As a result of the cash shortage in 1986, a dire need arose to borrow additional capital for the company. The company's lines of credit, at this point, were no longer open. Personal loans, the proceeds of which were turned over to KBDC, were therefore taken out in Jack and George's names. The number of personal loans greatly increased in 1986, however, due to the severe cash shortage. Three personal loan transactions from 1986 form the basis for the government's prosecution.

### Southwest Bank of Omaha

Jacob Mondschein was vice president of finance for KBDC and was in charge of the

---

[1]. The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

company's cash flow and control. On May 8, 1986, Mondschein and Jack Kroh met with Gerald Karlin, president of Southwest Bank of Omaha, to discuss the status of a corporate loan. Jack also requested personal loans of $250,000 for himself and his brother, representing the purpose of the loans as a "personal investment" with a New York investment firm. Karlin requested current financial statements from both Jack and George. Jack Kroh thereafter forwarded individual statements showing the brothers each had assets of $21 million and, according to the government, only $3.3 million in liabilities.[2] The defendant signed George's name on the statement as "George P. Kroh by J.K."[3] Mondschein subsequently returned promissory notes to Southwest Bank with the brothers' signatures (both signed the notes), and directed the bank to wire the loan proceeds to the brothers' personal accounts at banks in Kansas City.

The government offered evidence that Jack's liabilities as of the date of his financial statement, May 8, 1986, were $6,948,-628 and that on the same date George had liabilities of $6,913,395. After the money was received in the personal accounts, the funds were immediately transferred into a KBDC account at United Missouri Bank of Kansas City.

Throughout 1986, the company struggled with severe cash flow problems. Mondschein testified he regularly discussed the situation with the defendant, and was extremely distressed over Jack's directions to conduct questionable activities. According to the government's evidence a $7 million check kite was discovered on October 17, 1986 when United Missouri Bank presented several checks for payment to Commerce Bank.[4] Jack and George Kroh, Mondschein and other KBDC executives subsequently met with Commerce Bank officials. The bank was allegedly told that KBDC was experiencing cash flow problems that would be alleviated by several real estate deals that were expected to close before the end of the year. Commerce Bank agreed to treat the matter as simply an overdraft, rather than a kite, and considered it a loan that the defendant and George personally guaranteed.

This transaction was not the subject of an indictment but was brought out through the testimony of several witnesses. The defendant objected to its admissability, alleging its prejudicial impact far outweighed its probative value. The district court allowed the evidence, and the defendant challenges that ruling in this court. The government urges that the evidence was material and admissible under Fed.R. Evid. 404(b) as it showed intent and knowledge relevant to the charges of defrauding the other financial institutions.[5]

*Norbank*

The second charged bank transaction took place in mid-October 1986. On October 21, 1986, the defendant sought $500,-000 personal loans for himself and George from Norbank in Kansas City, representing that the money was to be used for a personal investment in the Hall Farm project.[6]

---

2. The defendant asserts the balance sheets demonstrated an additional $1.5 million in liabilities. This appears to be undisputed.

3. At the trial George testified that Jack had his authority to sign his name on financial papers.

4. A check kite typically involves two or more accounts, none of which has sufficient funds to cover the checks being written. *Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. First Nat'l Bank of Little Rock,* 774 F.2d 909, 911 (8th Cir.1985). Mondschein testified that the kite originally began as a check "float." A check float refers to the period of time "between the drawing of a check and its ultimate collection by presentment to the drawee bank." *Id.* Thus, a check float involves only one account, in which the

account holder takes advantage of the time it takes for a check to clear the account.

5. In view of our remand for a new trial, we need not pass on this claim. The admissability of such evidence must be appraised on the overall record of the new trial under Fed.R.Evid. 403.

6. The defendant presented evidence at trial that he and his brother had invested personally as limited partners in the Hall Farm project, a commercial-retail real estate development. KBDC was the developer of the project, and by July, 1986, had advanced over $500,000 in predevelopment costs. As limited partners, Kroh and his brother had an obligation to repay KBDC for the funds advanced. Kroh's defense

The president of Norbank, Frank Victor, received a letter with Jack and George's financial statements. The liabilities again were represented to be $3.3 million for each brother. Jack's liabilities at that time were actually $9,659,275, without considering the $7 million contingent liability owed to Commerce Bank as a result of the check kite. George's liabilities were $9,630,895 and his statement likewise did not disclose the Commerce Bank liability. Once again the monies obtained were immediately transferred to the corporation.

Norbank also insisted on obtaining the signature of the brothers' wives on personal guaranties. The evidence showed that the defendant's secretary and George's secretary signed Mary Lou Kroh and Carolyn Kroh's names to the guaranties without their knowledge or permission. Both secretaries testified they had signed the wives' names in the past as a matter of convenience. Significantly, George Kroh's secretary testified this practice was directed by Mondschein or other company personnel and that George Kroh was never involved.

### Firstate Savings & Loan

The final charged loan transaction occurred in mid-November 1986 when the defendant sought personal loans from Firstate Savings and Loan in Orlando, Florida. On this occasion the defendant obtained $400,000 for both himself and George, using once again the financial statements identifying $3.3 million as liabilities. Once again the defendant represented the loans would be used to invest in the Hall Farm project. The evidence showed that as of the date of the statement, August 15, 1986, the defendant had liabilities of $8,400,000, and as of November 14, 1986 when he sent

the letter, $12,105,793. George had liabilities in August of $8,418,395 and in November of $12,480,895. These figures did not include the $7 million Commerce Bank personal guaranty. George and Jack both signed personal notes for the Firstate loans, and the proceeds were immediately transferred to a corporate account.

George Kroh was called as a government witness at the trial. George was aware of KBDC's financial difficulties in 1986, but did not involve himself in seeking financial relief since he considered that his brother's end of the business. George's contribution to remedying the cash shortage was to secure more investment deals that would provide KBDC with much-needed cash. The evidence established that George signed the promissory notes for Southwest Bank, Norbank, and Firstate Savings. His testimony also established that he did this without knowing, at the time of the transaction, the accuracy of the representations made by the defendant and the overall circumstances surrounding the procurement of the loans.

### APPLICATION OF 18 U.S.C. §§ 2314 & 2315

The defendant challenges his convictions under 18 U.S.C. §§ 2314 and 2315 claiming his conduct does not fall within that proscribed by these statutes. These statutes prohibit the use of interstate commerce in the transportation of stolen or fraudulently obtained property.[7] The defendant argues that since wire transfers of money are no more than electronic credits and debits they are not "tangible goods of value" within the meaning of these statutes. Since he did not have actual physical possession and control of the money until it

---

was that the transfer of the Norbank loan funds to KBDC was consistent with the stated purpose of the loans.

**7.** 18 U.S.C. § 2314 provides:
  Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; * * * Shall be fined not more than $10,000 or imprisoned more than ten years, or both.

18 U.S.C. § 2315 provides:
  Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, * * * which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken; * * * Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

reached his personal account, Kroh claims the money was not stolen until after the act of interstate transportation.

■ Three circuits have considered and rejected Kroh's "tangible property" argument. *See United States v. Goldberg,* 830 F.2d 459 (3d Cir.1987); *United States v. Wright,* 791 F.2d 133 (10th Cir.1986); *United States v. Gilboe,* 684 F.2d 235 (2d Cir. 1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983). As stated by the *Gilboe* court:

> The question whether [section 2314] covers electronic transfers of funds appears to be one of first impression, but we do not regard it as a difficult one. Electronic signals in this context are the means by which funds are transported. The beginning of the transaction is money in one account and the ending is money in another. The manner in which the funds were moved does not affect the ability to obtain tangible paper dollars or a bank check from the receiving account. Indeed, we suspect that actual dollars rarely move between banks, * * *. If anything, the means of transfer here were essential to the success of the fraudulent scheme.

*Gilboe,* 684 F.2d at 238.

■ The history of these statutes suggests Congress was concerned with catching criminals seeking to avoid detection by crossing state lines. *See Dowling v. United States,* 473 U.S. 207, 219–20 & n. 10, 105 S.Ct. 3127, 3134, n. 10, 87 L.Ed.2d 152 (1985) (statutes intended as a method of attacking problems of criminals crossing state lines to avoid detection). The aim of the statute is to punish the act of fraud; the method by which the perpetrator transports the fruits of the fraud in interstate commerce is irrelevant. Thus, in this case, the conduct the statute condemns is obtaining the banks' approval for loans through allegedly fraudulent means. These statutes can properly cover wire transfers if such transfers serve to transfer the fruits of prohibited fraudulent acts.

■ Kroh relies on *Dowling,* 473 U.S. 207, 105 S.Ct. 3127, for his claim that prior physical possession of the stolen goods is a prerequisite to conviction under section 2314. We reject that argument as inconsistent with *Dowling* and the law of this circuit.

*Dowling* essentially involved copyright infringement, and the criminal provisions of the copyright statute, 17 U.S.C. § 506. This conduct did not fall within the scope of 18 U.S.C. § 2314 since "interference with copyright [interests] does not easily equate with theft, conversion, or fraud." *Dowling,* 473 U.S. at 217, 105 S.Ct. at 3133. The statement on which Kroh relies ("the provision seems clearly to contemplate * * * some prior physical taking of the subject goods") is not indicative of a requirement that literal possession occur prior to the act of transportation. Rather, it suggests only that copyright infringement does not result in the property deprivation that section 2314 is intended to punish. *See id.* at 217–18, 105 S.Ct. at 3133–34.

In *Loman v. United States,* 243 F.2d 327 (8th Cir.1957), this court stated: "To constitute the offense, the property transported in interstate commerce must have been stolen property and it must have been of that character before it was transported in interstate commerce." *Id.* at 329. This court concluded there was no violation of section 2314 since the interstate transportation occurred prior to the act of stealing the property. Kroh contends *Loman* supports his argument that there must be actual possession prior to interstate transportation.

■ We believe Kroh misreads *Loman.* The concern in *Loman* was whether the act prohibited by the statute had actually occurred at the time the interstate transportation occurred. *See id.* at 329. Here, any fraud that occurred took place before the banks wire transferred the money to Kroh's account. This argument therefore also fails.

## SUFFICIENCY OF THE EVIDENCE

■ Kroh challenges the sufficiency of the evidence, claiming the government did not establish the necessary unlawful intent. The intent necessary to support a convic-

tion under the offenses charged can be demonstrated by direct or circumstantial evidence that allows an inference of an unlawful intent. *See United States v. Lanier,* 838 F.2d 281, 283–84 (8th Cir.1988) (18 U.S.C. § 2314); *United States v. Andrade,* 788 F.2d 521, 527 (8th Cir.) (18 U.S.C. § 1343—wire fraud), *cert. denied sub nom.,* 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986); *United States v. Miller,* 725 F.2d 462, 468 (8th Cir.1984) (18 U.S.C. § 2315); *United States v. American Grain & Related Indus.,* 763 F.2d 312, 315 (8th Cir.1985) (18 U.S.C. § 371—conspiracy); *United States v. Henderson,* 645 F.2d 569, 576 (7th Cir.) (18 U.S.C. § 1014—false statements to banks), *cert. denied,* 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981). The government's evidence of Kroh's unlawful intent was based on the misstated liabilities, the representations as to the intended use of the loans, and the false signature of Kroh's wife on the Norbank guaranty.

Several witnesses testified that the defendant was solely responsible for the liability figures on the financial statements used to procure the loans. The government's evidence demonstrated that at the time Kroh applied for each of the charged loans, his liabilities substantially exceeded $3.3 million. Kroh was a knowledgeable businessman, with responsibility for the financial operations of a national real estate development corporation and substantial experience in dealing with banks. The jury could reasonably infer that Kroh was aware his true liabilities were substantially more than reported and that the true picture of his financial status would negatively influence the banks' decision. *See Henderson,* 645 F.2d at 576 (jury could infer that prior security interest was intentionally concealed since defendant's experience in dealing with banks would have alerted him to the negative impact of that liability).

Unlawful intent could also be inferred from the representations as to the intended use of the loans. The evidence established Kroh was intimately involved in KBDC's financial operations. The evidence also established that personal loans were taken out in some instances because corporate lines of credit were exhausted. Kroh's involvement with the company's financial operations and with financial institutions permits the inference that he made these representations with the intent to conceal the fact that the money was needed for KBDC.

Finally, we believe the evidence supports the inference of an unlawful intent with respect to the false signature on the Norbank guaranty. Norbank specifically informed Kroh the loans would not be made without his wife's signature on the guaranty. Kroh submitted a signed guaranty to Norbank, impliedly representing his wife had signed it. Kroh's experience in dealing with banks permits the inference that he was aware the bank would rely on that false signature in approving the loan. We thus conclude on the basis of the overall evidence that there was sufficient evidence to sustain the government's burden of proof that the defendant possessed the requisite intent to commit the crimes charged.

## SUFFICIENCY OF EVIDENCE OF A CONSPIRACY

■ Kroh claims the government failed to prove the existence of an unlawful agreement to support the conspiracy charge. The existence of an agreement, an essential component of a conspiracy, can be shown by circumstantial evidence of "concerted activity directed toward achievement of a common goal." *American Grain & Related Indus.,* 763 F.2d at 315. The indictment charged a conspiracy to defraud financial institutions by filing false financial statements and misrepresenting the intended use of the loans. George Kroh was named as a co-conspirator, along with unnamed co-conspirators.

George Kroh testified to having little knowledge or involvement with the financial side of KBDC. George had given Jack authority to sign for him in most instances.[8] George did not have any involvement

---

8. This testimony, along with testimony indicating George left all financial affairs to Jack, may

suggest an agency relationship existed between George and Jack that would support finding an

in the preparation of the financial statements submitted to the banks to obtain personal loans, and did not review the financial statements and promissory notes submitted for his signature. George participated in the October meeting with the Commerce Bank officials but prior to that time, was not aware of an ongoing check kite. George was aware of KBDC's substantial cash difficulties, but concentrated his efforts on securing investors who would provide needed cash. While only slight evidence is required to connect a person to a conspiracy, *United States v. Richmond*, 700 F.2d 1183, 1190 (8th Cir. 1983), we find the evidence presented insufficient to meet even this standard.

George's unrebutted testimony is replete with claims of non-involvement with the production of the financial statements or the procurement of personal loans. During direct examination, George reiterated that information on the financial statements and loan applications came from his brother or people working in KBDC's financial departments. George's testimony established that he has learned of the circumstances surrounding the loan transactions only since the company's demise in 1987. George was aware of the practice of turning personal loan proceeds over to the company, but there is no evidence that he participated in a scheme to defraud banks. The government's evidence amounts to no more than mere association, an insufficient basis for finding an agreement. *See Richmond*, 700 F.2d at 1190. This court stated in *United States v. Andrade*, 788 F.2d at 526: "The success of [the defendant's conspiracy] depended upon each participant performing his or her part in furtherance of the common object of the scheme and it was that common purpose which motivated each participant." Jack's scheme did not depend on George's participation. In fact, the evidence demonstrates the scheme could have operated entirely without George's participation, since loans were ob-

tained in some cases by simply signing George's name to the relevant documents.

There was, however, sufficient evidence of an unlawful agreement with Jacob Mondschein. Mondschein testified in detail about his regular meetings and discussions with Jack about resolving the cash flow difficulties. Mondschein testified that Jack set up the personal loans with the banks, and then directed Mondschein to follow through on the necessary paperwork. Mondschein was aware of the reasons given for obtaining loans and knew all personal loans were turned over to KBDC. Mondschein's participation was obviously crucial to the success of the scheme. Significantly, however, not until the proceedings in this court was Mondschein identified by the government as a co-conspirator.

We are troubled by the fact that the government never specifically identified Mondschein as a co-conspirator to the court or the jury. In response to the defendant's pre- and post-trial motions challenging the failure of the government to disclose the identity of the unnamed, unindicted co-conspirators, the government responded that it had maintained an "open file" on the case, so that no further disclosures were needed. Neither at the pre-trial hearing, nor during its opening or closing statements did the government ever identify Mondschein or any other person as a co-conspirator. The only co-conspirator identified for the jury was the defendant's brother George. Yet in its brief to this court the government claims Jacob Mondschein was a "principal coconspirator."

Although it is not necessary for the government to name an unidentified co-conspirator, *see United States v. Rodriguez*, 765 F.2d 1546, 1552 (11th Cir.1985), we question the fairness of the government's strategy of relying on Mondschein as a co-conspirator for this appeal, but failing to identify him as such for the jury. The direct and cross-examination of Mondschein focused on establishing the defendant's knowledge of KBDC's financial difficulties

agreement based on these facts. Basic principles of agency, however, defeat this assumption. "Authority to do illegal or tortious acts, whether or not criminal, is not readily inferred." Re-

statement (Second) of Agency § 34 comment g (1983). There is no evidence suggesting George's grant of authority to his brother went so far as to authorize defrauding banks.

and his participation in questionable financial practices, rather than establishing a conspiracy. During its closing argument, the government relied on Mondschein's testimony only with respect to the uncharged check kite. *Cf. United States v. Albert,* 675 F.2d 712, 713–15 & n. 2 (5th Cir.1982) (where government identified unnamed co-conspirators prior to trial and relied on evidence of conspiracy with those co-conspirators in presenting case to jury, conviction on conspiracy charge could be upheld).

Since the trial evidence focused on an alleged illegal scheme between George Kroh and the defendant there is no means to know whether the jury verdict is based on the only conspiracy proven—that between Mondschein and the defendant. This uncertainty becomes critical when the evidence of George Kroh's guilty plea is considered.

## GEORGE KROH'S GUILTY PLEA

■ The government, over vigorous objection, was allowed to introduce in its case-in-chief the guilty plea of the defendant's brother, George Kroh. George had pleaded guilty to *a conspiracy with the defendant to defraud the banks in question.* The government justifies the affirmative proof on the basis that it showed the credibility of the witness and his admitted participation in the conspiracy. *See United States v. Hutchings,* 751 F.2d 230, 237 (8th Cir.1984), *cert. denied,* 474 U.S. 829, 106 S.Ct. 92, 88 L.Ed.2d 75 (1985). Nevertheless, the government concedes that the guilty plea could not be used as substantive proof of the conspiracy itself. *United States v. Braidlow,* 806 F.2d 781, 783 (8th Cir.1986); *Hutchings,* 751 F.2d at 237. We would not have too much difficulty with the admissability of the plea if in fact there was independent evidence of a conspiracy between the defendant and George Kroh. As we have discussed, however, the proof shows that George was not aware of the loans or the circumstances surrounding the loans until after the transaction. There is no evidence, direct or circumstantial, that George Kroh entered into any conspiracy to defraud the three banks in question.

Evaluating the record in light of the absence of evidence that George conspired to defraud the banks with his brother, we find the guilty plea was erroneously admitted. We agree with the defendant that despite the cautionary instruction given by the court, once the jury heard the plea, the only obvious inference was "if George admitted guilt, the defendant must also be guilty."

While the evidence as we review it may establish an agreement with Mondschein, the jury was never given the opportunity to consider Mondschein as a co-conspirator. The jury was essentially told George was the co-conspirator, and since no evidence of a conspiracy with George was presented, George's plea effectively operated as the only substantive proof of a conspiracy and was therefore erroneously admitted.

## PREJUDICIAL ERROR

■ Having reached this conclusion we then face the question whether the erroneous admission of the guilty plea on the conspiracy count constituted prejudicial error requiring a new trial. *United States v. Johnson,* 879 F.2d 331, 335 (8th Cir.1989). We feel the wrongful admission of George's plea was overwhelmingly prejudicial and tainted the entire trial. The improperly admitted guilty plea not only affected the defendant's credibility with respect to the conspiracy charge, it severely impaired his defense on the remaining charges. The defendant vigorously disputed that he acted with intent to defraud banks and offered credible justifications that, without the detrimental impact of the guilty plea, may have created reasonable doubt in the minds of some jurors.

The thirteen charges all relate to the same three bank loans, and the same false statements—the understated liabilities, the misrepresented purposes, and the false signature of his wife—are central to all the charges. Kroh's credibility was essential to the jury's determination of whether he had made these statements with the intent to defraud the banks.

Jack Kroh claimed he was not responsible for the understated liabilities. His claim was supported by the testimony of an

independent CPA who worked on KBDC matters, who testified she received pertinent personal financial information from the accounting department employees. The defendant also correctly points out that the format of the personal financial statements, designed by a former employee, did not accurately account for all liabilities within the liability section. For example, Jack Kroh's house was listed as an asset, but the outstanding mortgage was simply identified in the asset section without being included in the liability calculation. He also points out that his assets and net worth were severly undercalculated. This claim is supported by the financial statements prepared for estate planning purposes by an outside-the-company CPA. Thus Jack Kroh's testimony at trial, if believed, supports his claim that the defendant was relying on the asset and liability figures that others were responsible for updating.

The defendant contends he did not misrepresent to the banks how the loan proceeds would be used. He informed Southwest Bank that the loan proceeds were for a "personal investment," and later suggested the funds were for an investment with "Herb Allen." Southwest Bank's documentation noted only "personal investment" as the purpose of the loan. The defendant contends, and the bank official testifying agreed, that placing the money in his largest asset, KBDC, was a personal investment. The bank official also testified it did not matter to the bank how the money was used. This testimony supports the claim that Kroh did not make the statements with the intent to influence the bank's decision by promising the loans would only be used for personal investment with Herb Allen.

Norbank and Firstate were told the loans were for investment in the Hall Farm project. Jack and George were limited partners in this commercial-retail development with the Hall family. KBDC was the general contractor for the project. As limited partners, Jack and George had an obligation to pay for development costs. By July, 1986, KBDC had advanced approximately $500,000 in development costs, and

substantially more by the end of 1986, for which it was entitled to be reimbursed by the limited partners. Thus, Jack Kroh argued that the turning over to KBDC of loan proceeds was literally a true statement since Jack and George owed the company money for this project.

Jack Kroh also claimed the government did not prove he made a false "statement" by submitting to Norbank his wife's guaranty with his secretary's signature. There was testimony that it was standard practice for the secretary to sign Mary Lou Kroh's name, and that his wife had previously acquiesced in this practice. The defendant contended that in light of this evidence of authority to sign, he could not be convicted for making a false statement since the statement made, his wife's signature, was authorized. This claim of authority to sign, if believed, supports Kroh's contention that the statement was not made with the intent to influence the bank's decision.

Jack Kroh's credibility was therefore crucial to deciding all thirteen counts, and in our judgment nothing could have been more prejudicial to him than his brother's accusatory guilty plea that he had conspired with Jack to commit the bank fraud in question. Where the defendant's credibility is such a vital issue, as in this case, we do not believe the trial judge's cautionary instruction diminished the prejudicial impact of the erroneously admitted plea. *United States v. St. Clair*, 855 F.2d 518, 523 (8th Cir.1988); *American Grain & Related Indus.*, 763 F.2d at 319–20.

Ordinarily, we would not reach this result where the evidence of guilt supports the verdict. Aggravating circumstances in this case—the government's tactical decision to rely on George as its principal co-conspirator, the lack of evidence of a conspiracy with George, and the credible and strong defenses presented by Kroh—compel such a result. We are unable to say with any confidence that the defendant received a fair trial in terms of having his credibility assessed separately from the substantial influence of his brother's plea

of guilty.[9] We find particularly compelling in this regard Justice Jackson's statements in *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949):

> As a practical matter, the accused often is confronted with * * * statements by others * * * which help to persuade the jury of existence of the conspiracy itself. In other words, a conspiracy often is proved by evidence that is admissible only upon assumption that [a] conspiracy existed. The naive assumption that prejudicial effects can be overcome by instructions to the jury all practicing lawyers know to be unmitigated fiction. * * * * It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together.

*Id.* at 453–54, 69 S.Ct. at 723 (Jackson, J., concurring) (citations omitted).

We find the admission of the guilty plea was not harmless error but in fact prejudicially tainted all counts. The judgment of conviction is vacated and the defendant is to receive a new trial. Judgment reversed and the cause remanded for a new trial.[10]

---

BOWMAN, Circuit Judge, dissenting.

I concur in that portion of the Court's opinion regarding the application of 18

---

9. One may question why George would enter such a plea when the evidence did not support the charge. Plea bargains represent compromises involving many concerns. George faced a ten-year sentence or more if he was found guilty of all the charges his brother faced. Instead, he received only fifty-seven days in jail.

10. The dissent urges that our opinion fails to give proper deference to the jury's findings of a conspiracy between the Kroh brothers. This begs the question. While an appellate court has a duty to sustain a jury's findings of fact where there is sufficient evidence to support those findings, it has an equally fundamental responsibility to reverse those findings where there is insufficient evidence to support the conviction. *See Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979). Although the dissent goes to great lengths to quote portions of the transcript, in all due respect, the dissent selectively edits the testimony, omitting those portions that demonstrate George Kroh's complete isolation from the defendant's loan activities. For example, George stated he did not involve himself *at all* in the financial aspects of KBDC (Tr. V at 794); that he could only "assume" what the defendant did with his (George's) signed financial statements (Tr. V at 798); that he did not know, in August, 1986, what Mondschein was doing to deal with the cash flow problems (Tr. V at 801); that he did not know anything about the Southwest Bank loan (Tr. V at 812–13); that he did not know about the Norbank loan, or using the loan proceeds for the Hall Farm project (Tr. V at 821–22); and that he did not know anything, in November, 1986, about the Firstate Savings loan (Tr. V at 827). Although George Kroh's secretary had been authorized to sign his wife's name in the past, George did not know who signed his wife's name to the Norbank guaranty, and did not have anything to do with getting the guaranty signed (Tr. V at 825–26).

George Kroh did not testify to any contemporaneous knowledge of a scheme to defraud banks, but only gave a hindsight analysis of the events. In fact, as the dissent acknowledges, the defendant was "using George Kroh in carrying out the fraudulent scheme." The fact that the defendant took advantage of his brother does not, however, amount to an illegal agreement. Likewise, George's knowledge of KBDC's financial difficulties is not evidence of an illegal agreement to defraud banks. George testified that his response to the financial crisis was to push harder on rent collections and equity sales (Tr. V at 801, 810), not to engage in a conspiracy to defraud banks. In light of this testimony, it is difficult for us to understand the dissent's argument that the government did not rely on George's guilty plea for proof of the conspiracy.

The dissent's assessment of the defendant's credibility violates the very principles it claims the majority opinion disregards. Credibility assessments are the province of the jury. Unfortunately, in this case, the jury was not given the opportunity to consider the defendant's credibility without the overwhelming impact of his brother's guilty plea. The dissent's attempt to minimize the impact of George's guilty plea, as if the jury barely understood that George's plea involved a conspiracy with the defendant, is unrealistic. The government used George as a central figure in its overall proof of Jack Kroh's efforts to obtain money from the banks. Jack was not just charged with a conspiracy with unknown persons; Jack was charged with a conspiracy with his brother George. The government's entire case was based on this scenario. The only way the government could make the vital connective proof of an illegal conspiracy between the two brothers was its affirmative proof that George had entered a plea of guilty to a charge of conspiracy to commit bank fraud with Jack. No reasonable jury could evaluate Jack's denial of such a conspiracy once it was shown his brother George had pled guilty to the same charge.

U.S.C. §§ 2314 and 2315 to wire transfers and in the discussion concerning the sufficiency of the evidence as to counts two through thirteen. *Ante* at 1528–1529, 1529. Because I disagree with the majority's interpretation of the law concerning the admissibility of evidence of George Kroh's guilty plea, I respectfully dissent from those parts of the opinion and from the result.

The Court here is reversing all thirteen of John Kroh's criminal convictions because the District Court admitted evidence of George Kroh's guilty plea at John's trial. Despite the Court's acknowledgment that there was sufficient evidence to convict John on twelve of the counts, *ante* at 1526, it finds the evidence of George's guilty plea so prejudicial that all the convictions should be reversed. I believe the evidence in question was properly received. Moreover, I do not believe that John Kroh suffered any prejudice by reason of its admission, or that the evidence was insufficient on any of the counts. I therefore would affirm all of his convictions.

John Kroh's defense counsel filed a pretrial motion in limine to suppress references to George Kroh's plea agreement and convictions. At the hearing on this motion, the prosecutor told the district judge he intended to question George Kroh on direct examination about George's plea agreement with the government and his convictions, but stated that the written plea agreement would not be offered as evidence. The district judge said he would not allow the written agreement into evidence, nor would he allow the prosecutor to read from it. The judge did indicate that he would permit questioning of George Kroh concerning his convictions and the plea agreement, and further questioning by the government if the defense opened the issue on cross-examination. Transcript Vol. I at 9–10.

It is important initially to set forth in full the only references during the trial to George Kroh's guilty plea. Such elaboration in context will demonstrate that the plea was not presented in an inflammatory way and was not unduly emphasized, and will provide the basis for properly applying the law to the facts of this case.

During the government's opening statement, the prosecutor told the jury:

George Kroh will testify, Jack's brother. George Kroh will come in here and tell you first of all, he will tell you that he has pleaded guilty to several charges involving banks, that he has pleaded guilty in connection with a plea bargain with me; and he will lay that out for you.

Transcript Vol. II at 78.

The prosecutor's statement did not mention that George Kroh was charged with or pleaded guilty to conspiracy with his brother or anyone else. There was no objection by the defense.

During the government's direct examination of George Kroh, the government first established the witness's identity and his relationship to John Kroh and to Kroh Brothers Development Company (KBDC). The following exchange then took place:

Q: (by the government): All right, sir. And now, Mr. Kroh, you are appearing today as a result of a plea agreement with the United States, correct?

A: (by George Kroh): Yes, sir.

Q: And can you tell the members of the jury when it was that that plea bargain arrangement was reached, if you can recall?

A: Last spring sometime.

Q: Okay. And just to summarize it, if I may for you, and correct me if any of this is incorrect, but just summarizing that, that has been reduced to a pleading, correct?

A: That is correct.

Q: The agreement between you and the United States is in essence as follows, is it not. Your part of the agreement is that you came into Federal Court and pled guilty to three felony counts of bank fraud, correct?

[Defense objected. Bench conference at which defense counsel explained that he wanted to be certain the government did not go into George's agreement to tell the truth. If so, he would object. The prosecutor assured

the judge he intended to stay within the limits delineated at the hearing on the motion in limine. The proceedings returned to open court.]

Q: Just so that we are back on track here. Mr. Kroh, the agreement is essentially that you came into Federal Court here and pled guilty to three counts of false statements to banks; isn't that essentially it?

A: Yes, sir.

Q: And one of those counts involved, I think, a conspiracy count, correct?

A: That is correct.

Q: And you did that and you also told the United States that you would cooperate with the Government in furtherance of its investigation in this matter, correct?

A: That's correct.

Q: And that cooperation included testifying before a federal grand jury, correct?

A: Yes, sir.

Q: And also testifying here?

A: Yes, sir.

Q: Okay. Now, in exchange for that, the United States has told you, first of all, that whatever cooperation you lend to it, it would tell the sentencing judge at the time of sentencing, correct?

A: That is correct.

Q: And it further told you that there would be a five-year cap or a lid on any sentence to be imposed in your case; isn't that true?

A: That is correct.

Q: Now, does that fairly summarize what the agreement was between you and the United States?

A: Yes, it does.

Q: All right. Did you, in fact, plead guilty to those charges?

A: I did.

Q: Were you sentenced?

A: Yes, sir.

Q: Can you tell us what your initial sentence was?

A: Two three-year sentences, running concurrently.

Q: Okay. And that was imposed by Chief Judge Wright of this district?

A: That is correct.

Q: Was that sentence subsequently reduced?

A: Yes, sir.

Q: And can you tell us—did you actually go off and do time?

A: Yes, I did.

Q: Was it reduced to what, sir?

A: Sixty days.

Q: Was there anything else provided as a reduction of that sentence?

A: Five years probation.

Q: And any other caveats to that sentence?

A: Yes. A restitution to the two banks.

Q: Which banks are those, Mr. Kroh?

A: Norbank and Kansas National.

Q: You are also appearing today in relationship to an immunity agreement that the United States has gotten and you have been provided with, correct?

A: That is correct.

Q: And essentially that immunity agreement is that whatever you say we can't turn around and use against you, right?

A: That's correct.

Q: In other words, your Fifth Amendment right is no longer applicable in this case?

A: Yes, sir.

Transcript Vol. V at 780–84.

The conspiracy charge was mentioned specifically only once and, in fact, a plea of guilty to conspiracy *with John Kroh* was never mentioned in this exchange. The reference was quite obviously in the context of setting out the entire agreement, and was not emphasized.

George Kroh's testimony was preceded by this limiting instruction, which also was read without material alteration as Instruction 22 at the close of all the evidence:

Ladies and gentlemen of the jury, before we begin the testimony of this witness, I have an additional instruction to read to you. You are going to hear evidence from the witness, George P. Kroh, who you will hear evidence that he has made

a plea agreement with the Government. You may give his testimony such weight as you think it deserves. Whether or not his testimony may have been influenced by the plea agreement is for you to determine.

The witness' guilty plea cannot be considered by you as evidence of this defendant's guilt. The witness' guilty plea can be considered by you only for the purpose of determining how much, if at all, to rely upon the witness' testimony.

Transcript Vol. V at 776–77; Vol. VII at 1269.

Finally, the government explored George Kroh's guilty plea further on redirect examination. This was invited by the following testimony on cross-examination:

Q (by defense counsel): Is it also correct to say that you never agreed with Jack to make a false statement on a balance sheet?

A (by George Kroh): Do you mean like we sat down together and agreed?

Q: Right.

A: I would say that's—we didn't sit down and write something up, no.

Q: Nor did he come to you and say, "Jack [sic], I am going to file a false financial statement on your behalf"?

A: No.

Q: And you had no knowledge of him having done so until after the fact?

A: That's correct.

Q: You and Jack never agreed to defraud any bank, did you?

A: Again, we didn't sit down and draw up an agreement and sign some agreement that we were going out to defraud banks, no, sir.

Transcript Vol. V at 875–76.

On redirect, the prosecutor and witness had this exchange:

Q (by the government): Mr. Kroh, you were asked some questions about do you agree with your brother to submit false financial statements to banks. I understand that you responded you didn't sit down and draw up an agreement with them. But isn't it true, Mr. Kroh, that you came in here to Federal Court and pled guilty to that charge?

A (by George Kroh): Yes, sir.

[Defense counsel objected. Bench conference. Objection overruled.]

Q: Mr. Kroh, you came in here to Federal Court and appeared before Chief Judge Scott O. Wright, correct?

A: That's correct.

Q: And at that time you were placed under oath, correct?

A: Yes, sir.

Q: And at that time you tendered a guilty plea to conspiring with your brother over here to submit false statements to banks, right?

A: That's correct.

Q: And—

[Objection renewed. Bench conference and motion for mistrial. Denied.]

Transcript Vol. V at 878–82.

That was the full extent of the discussion of George Kroh's guilty plea on redirect examination. It never was mentioned again, either in closing argument or otherwise. There are no other references to George Kroh's plea agreement or his convictions anywhere in the transcript of this six-day trial.

"The trial court has broad discretion in determining what evidence can be admitted, and its decision will be overturned on appeal only if there was an abuse of discretion." *Rothgeb v. United States*, 789 F.2d 647, 650 (8th Cir.1986). The discretion accorded lower courts in determining admissibility of evidence "is particularly broad in a conspiracy trial." *United States v. Davis*, 882 F.2d 1334, 1343 (8th Cir.1989), *petition for cert. filed*, No. 89–1043 (U.S. Dec. 23, 1989). The District Court stayed well within its discretion in allowing the government to question George Kroh on direct and redirect examination about his plea agreement and convictions.

In the Eighth Circuit, the law is clear that "a confederate's guilty plea is admissible, *even on the Government's direct examination of the witness,* as evidence of the witness' credibility, or of his acknowledgment of participation in the offense."

*United States v. Hutchings,* 751 F.2d 230, 237 (8th Cir.1984) (emphasis added) (witness testified on direct examination about his plea of guilty to aiding and abetting defendant in crime with which defendant was charged), *cert. denied,* 474 U.S. 829, 106 S.Ct. 92, 88 L.Ed.2d 75 (1985). The witness's plea or evidence thereof, however, "cannot be used as substantive evidence of the defendant's guilt," and the jury should be so instructed. *Id.; see also United States v. Drews,* 877 F.2d 10, 12 (8th Cir.1989) (no abuse of discretion in receiving witness-coconspirators' *written* plea agreements into evidence when jurors were instructed that pleas were not evidence of substantive guilt of defendant but only went to credibility of witnesses, and government did not indicate "it had independently verified the witnesses' testimony"); *United States v. Braidlow,* 806 F.2d 781, 783 (8th Cir.1986) (no error in admitting evidence of guilty pleas of confederates on direct examination when the evidence was not used as substantive evidence of defendant's guilt, cautionary instructions were given, and evidence was not emphasized).

The evidence of George Kroh's guilty plea brought out on direct examination clearly was admissible under the law of this Circuit. The written plea agreement was not offered in evidence, nor was any part of the text read to the jury. The government focused only on the fact of the guilty plea and the quid pro quo involved in George's agreement with the government. The prosecutor did not even mention that the conspiracy to which George Kroh pleaded guilty was a conspiracy with John Kroh and, in any event, the District Court instructed the jury twice that evidence of George's plea was not to be interpreted as evidence of John's guilt, but was to be used only in determining the weight to be given to George's testimony. The charges to which George pleaded guilty played only a small part in his direct examination and certainly were not emphasized by the government. Neither the guilty plea nor

the agreement was mentioned in the prosecutor's closing argument; the government relied on neither for its proof of John's participation in a conspiracy. The District Court plainly did not abuse its discretion in allowing this direct testimony.[1]

There remains the question whether the guilty plea was emphasized to John Kroh's prejudice on the government's redirect examination of George Kroh. It is clear from the record that on redirect the government properly used George Kroh's guilty plea for impeachment purposes. On cross-examination, the defense asked George if he had agreed with John to defraud banks. George's denial, though equivocal, opened the door for the government to impeach that testimony. "The trial court does not abuse its discretion by allowing the use of evidence on redirect examination to clarify an issue that was opened up by the defense on cross-examination—even when this evidence would otherwise be inadmissible." *Braidlow,* 806 F.2d at 783. On cross-examination, George Kroh testified "no agreement," but his guilty plea was to the contrary. The guilty plea already had been mentioned in another context, was clearly probative of the credibility of George's testimony denying that he had agreed with John to defraud banks, and was not unfairly prejudicial. It is also a reiterated "acknowledgment of participation in the offense," which participation George was attempting to deny. *Hutchings,* 751 F.2d at 237. In these circumstances, it was proper for the government to ask George Kroh on redirect examination whether he had pleaded guilty to conspiracy with his brother to submit false statements to banks. Defense counsel opened up this line of questioning and the government was entitled to pursue it to show that George had been less than candid in his answers on cross-examination.

John Kroh argues, and the Court's opinion here agrees, that, because there is no other evidence of his participation in a conspiracy with George, the jury must have disregarded the District Court's limiting in-

---

1. In the event the defense intended the continuing objection it made following the hearing on the motion in limine to cover the reference to the plea bargain in the government's opening statement, the same reasoning applies and there is no error in the opening statement.

structions and used George's guilty plea as evidence of John's guilt. A review of the transcript demonstrates, however, that there is substantial evidence of John Kroh's participation in a conspiracy with George Kroh to defraud banks. The Court's opinion seems determined to view the evidence in the light most favorable to John Kroh, despite the jury verdict finding him guilty as charged. In taking this unusual approach, the Court violates the well-established rule that, in our review of a criminal conviction, the evidence must be viewed in the light most favorable to sustaining the jury verdict, giving the government the benefit of all reasonable inferences that may be drawn. *United States v. Marin–Cifuentes*, 866 F.2d 988, 992 (8th Cir.1989).

The trial record contains abundant evidence showing a conspiracy involving George and John. While much of it is circumstantial, "[t]he independent evidence showing a conspiracy may be direct or totally circumstantial." *United States v. Jankowski*, 713 F.2d 394, 396 (8th Cir. 1983), *cert. denied*, 464 U.S. 1051, 104 S.Ct. 732, 79 L.Ed.2d 192 (1984).

The former personal secretaries of John and George Kroh, and George Kroh himself, all testified that the liability figures on the brothers' personal financial statements were supplied by John Kroh. Evidence from several witnesses demonstrates that those liabilities were significantly understated. The individual false financial statements were signed by John and George Kroh and sent to the defrauded banks to obtain personal loans.

In May 1986, John Kroh represented to Southwest Bank of Omaha that he wanted a total of half a million dollars in personal loans for himself and his brother for a "personal investment" with a New York investment firm. Southwest, upon reviewing the false personal financial statements, approved the loans and, after John and George Kroh signed promissory notes, wired the funds to the brothers' personal accounts. John and George promptly signed personal checks transferring the money into a KBDC account.

In October 1986, on John's representation that the funds were to be used for personal investments in the Hall Farms project, the Krohs applied for a combined one million dollars in personal loans from Norbank of North Kansas City. After receiving and reviewing the false personal financial statements signed by John and George Kroh, the bank approved the loans. Norbank also required personal guaranties of the brothers' wives, but the signatures furnished to the bank upon which it relied were in fact those of the brothers' secretaries.[2] After signing the promissory

---

**2.** In its opinion the Court says, "Significantly, George Kroh's secretary testified [that the practice of her signing George Kroh's wife's name to personal guaranties] was directed by Mondschein or other company personnel and that George Kroh was never involved." *Ante* at 1528. That is not how I read the secretary's testimony:

Q (by the government): Now, Ms. Bosch, did you have any involvement in the securing of a personal loan by Mr. George Kroh at the Norbank of North Kansas City in October of 1986?
A (by Michelle Bosch, George Kroh's former personal secretary): Yes, I did.
Q: And can you tell me how it was that that first came about, what happened?
A: The only thing that I can remember about the loan is that I signed Carolyn Kroh's name on the guaranty.
Q: Do you remember how that event occurred or was it—is it not clear at this time?
A: Well, I didn't pay a lot of attention to the loans because it just didn't—it wasn't something that I needed to be concerned about.

There were other people in the company that took care of that. If her name was required, I had been asked to sign it over the years. I cannot tell you if someone specifically asked me to sign it on that particular occasion or if I simply signed it because I had done so previously.
Q: Just as an—I understand it would be difficult to remember what happened in October 1986, but as a general practice, would you sign her name frequently, infrequently, what?
A: Frequently.
Q: And from whom would you generally receive those directions as to whether or not to sign?
A: George Kroh.

    *     *     *     *     *     *

Q (by defense counsel): You identified, I believe, the Norbank guaranty which I won't put on the board, but you did identify that as your signature?
A (by Michelle Bosch): Yes.
Q: Do you have a specific recollection of whether or not Mr. George Kroh, on that

notes, John and George Kroh received and deposited in their personal accounts the money orders for the loans and immediately signed checks for the loan amounts made payable to KBDC, which by now, it was clear to all on the inside, was having very serious cash flow problems.

Finally, again upon the representation that the funds were for personal investment in Hall Farms, the brothers acquired personal loans totalling $800,000 from Firstate Savings & Loan of Orlando in November 1986 and immediately transferred the proceeds into the sinking ship that KBDC had become.

It is obvious from the evidence that John Kroh, in a desperate scheme to keep KBDC afloat, was knowingly defrauding banks and was using George Kroh in carrying out the fraudulent scheme. As for the conspiracy, that is, George Kroh's knowing involvement in the scheme, his own testimony is particularly damning.

On direct examination:

Q (by the government): When did it become apparent to you that Kroh Brothers Development Company was in financial trouble in 1986?

A (by George Kroh): In August. That was the first time.

Q: Why is that? Why did it hit you in August?

A: There were some problems paying the bills.

\* \* \* \* \* \*

[Discussing George Kroh's personal financial statement that was sent to Norbank.]

Q: In October of 1986, can you tell me whether or not the $3.3 million accu-

rately reflected the total liabilities that you had?

A: I don't believe it did.

Q: Can you tell me back then what you thought your liabilities were?

A: I thought they were about $5 million.

\* \* \* \* \* \*

Q: Okay. And in connection with this financial statement that went to the Firstate Savings & Loan, can you tell me whether or not back in November of 1986, $3.3 million accurately reflected your bank liabilities?

A: No, it did not.

Q: Why do you say that, sir?

A: Well, I had more than that borrowed.

Q: Do you remember at that time how much you thought that you had owed to banks?

A: I thought it was around five, five and a half million.

Transcript Vol. V at 800, 822–23, 828.

On cross-examination:

Q (by defense counsel): Do you believe that the—that if this, say the American Express and the institutional deals that you had working, if they had gone through, do you think that it would have made a difference in the ultimate outcome relative to Kroh Brothers?

A (by George Kroh): It might have slowed it down a little bit, but I don't think it would have made an ultimate decision of whether the company would have gone down or not.

Q: Do you think that that ultimately would have taken place in any event?

A: I am afraid so.

particular signature, the Norbank documents, directed you to sign that particular document?
A: No, I don't have a specific recollection.
Q: Do you have a specific recollection of ever signing Carolyn Kroh's name without authority from Mr. George Kroh or at his direction?
A: As I stated earlier, when I initially started signing her name, it was always at George Kroh's direct request. As time went on, the longer I worked with him, the pattern had been established and I knew that he expected

me to do this so I did it when it was needed to be done and he was not available to—if they needed the signature, and if he was not standing there to tell me to do this, I would do it because I had been authorized previously to do it and the pattern had been established.
Q: So on the—so basically on Norbank, you either signed it at his direction or because of the pattern that had been established; would that be fair to say?
A: Exactly.
Transcript Vol. IV at 521–22, 533–34.

Q: All right. There was some kind of an inherent defect in the operation; is that what you are saying?

A: No, I think it was too late. You asked if these would happen—if a closing or two in December or November of '86 would have helped out. I am saying I think it was too late at that point.

    \*    \*    \*    \*    \*    \*

Q: Would it be correct to say, Mr. Kroh, that you never knowingly signed a false financial statement?

A: I would say that's—well, up until the very end. I'd say up through—after Commerce Bank there might have been a question.

Q: There was a question?

A: *After Commerce Bank I did.*

Transcript Vol. V at 845–46, 874–75 (emphasis added).

After the Commerce Bank check-kiting debacle[3]—the day after, in the case of Norbank—George and John Kroh each signed false financial statements omitting, among other liabilities, the personal guaranties for seven million dollars they just had given to Commerce, and used those false statements to procure loans (that they knowingly misrepresented as being for their personal use) from two of the banks in question. While defense counsel attempted to cure this damaging testimony, it is, in fact, an admission of guilt that the jury could have credited.

Although it may be true that George was not involved in the negotiations for the loans or the preparation of the personal financial statements, he signed the financial statements knowing them to be false, signed promissory notes for personal loans, and then signed checks transferring the proceeds of the loans to KBDC, knowing full well that KBDC had lost its ability to borrow and that it was headed for financial disaster. "Secrecy and concealment are essential features of successful conspiracy.... Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." *Blumenthal v. United States,* 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947).

It simply cannot be said that there is no evidence of a George–John conspiracy, as the majority alleges.[4] As the Court acknowledges in its opinion, "[O]nly slight evidence is required to connect a person to a conspiracy." *Ante* at 1531. Here there is substantial circumstantial evidence of a conspiracy between the brothers sufficient to convict John Kroh of the conspiracy charge. Considering the strength of the government's case, there is simply no reason to speculate, as the Court does, that the jury must have disregarded the District Court's repeated instructions not to consid-

---

**3.** For a review of the evidence regarding this incident, see *ante* at 1527.

**4.** The Court mischaracterizes the evidence and impliedly misstates the law when it says, "In fact, the evidence demonstrates the scheme could have operated entirely without George's participation, since loans were obtained in some cases by simply signing George's name to the relevant documents." *Ante* at 1531. The evidence was that only one, not "some," of the three financial statements sent to the subject banks was signed by John for George, and none of the promissory notes. It is by no means clear that all of the banks involved would have acquiesced in John's signing for George on the loan documents, and still have made the loans. Had George refused to sign or questioned the accuracy of the documents, no more than half and perhaps none of the funds could have been

swindled from the banks. As to the law, the statute is clear: "If two or more persons conspire ... and one or more of such persons do any act to effect the object of the conspiracy," they commit a criminal offense. 18 U.S.C. § 371 (1988). The unlawful object of the conspiracy need not even be completed, and only one of the coconspirators must do an act in furtherance of the scheme. The act shown need not be an act critical to the success of the plan. While a defendant's indispensability to the perpetration of a completed crime surely would be evidence of his participation in the crime and in a conspiracy with a fellow actor to complete the crime, an absence of indispensability does not prove innocence. Thus, evidence that George's participation was not essential to the bank fraud, if in fact there were such evidence, would not establish George's nonparticipation in the conspiracy.

er George's guilty plea as evidence of John's guilt.

The Court concludes that the references to George Kroh's guilty plea "tainted the entire trial" because of the damage they did to John Kroh's credibility, which credibility was crucial to his defense on all counts. *Ante* at 1532. Having carefully reviewed the record, however, I am convinced that the government's fleeting (and proper) references to George's guilty plea could have had little impact on the jury's assessment of John's credibility. It is apparent from the trial transcript that John Kroh himself did the most serious damage to his credibility. Throughout cross-examination, he sparred with the prosecutor, displaying hostility and a determination never to give a straight answer, constantly "splitting hairs," as the prosecutor put it at one point. He continually manifested memory lapses. He was vague, evasive, and equivocal, and frequently declared that he was having difficulty understanding the government's straightforward and simple questions. The general impression that remains after reading the transcript is of a witness attempting to sabotage the search for the truth, rather than of an innocent victim trying to clear his name. All this would have been especially vivid in the minds of the jurors, since John testified on the last day of the trial, and the jury began its deliberations that same day. It therefore is not difficult to understand why the jury rejected his attempts to convince them that he acted without fraudulent intent.

The trial record is replete with evidence that severely tested what the Court calls "the credible and strong defenses presented by Kroh."[5] *Ante* at 1533. In any event, "[t]he credibility of the evidence is for the jury to determine," *United States v. Lee*, 743 F.2d 1240, 1251 (8th Cir.1984) (conspiracy conviction affirmed despite de-

fendant's testimony that his alleged conspirational actions were innocent of any illegal purpose), and the jury obviously did not believe John Kroh. I cannot agree that the three fleeting and entirely proper references in a six-day trial to George Kroh's guilty plea, presented for the purpose of assisting the jury in its evaluation of George's testimony and not of John's, prejudiced John's right to a fair trial. Our Court's deference to what it perceives to be the "credibility" of this white-collar defendant, and its discounting of the jury's ability to follow the trial court's instructions, to weigh the credibility of the witnesses, and to evaluate John's asserted defenses, is unjustified, improper, and regrettable.

I would affirm the convictions on all counts.

---

**5.** I find the "credible and strong" characterization highly questionable. To me it is far from credible that a well-educated and experienced business person, one of the principals of a substantial business enterprise, would rely totally upon underlings in his company to prepare his personal financial statements, and then either never review the statements for accuracy or be so unaware of his own finances that he

did not recognize multi-million dollar errors— including the omission of multi-million dollar liabilities that he only recently had assumed. Equally implausible is that such a businessman would obtain funds for his floundering company by misrepresenting to the lending banks that the monies were for personal use, yet do so without intending to deceive the banks.