UNITED STATES of America, Appellee,

v.

John A. KROH, Jr., Appellant.

No. 89–1070.

United States Court of Appeals,
Eighth Circuit.

Submitted July 18, 1990.

Decided Sept. 12, 1990.

Darrell McGowen, Glen Ellyn, Ill., Charles E. Atwell, Kansas City, Mo., for appellant.

Robert E. Larsen, Kansas City, Mo., for appellee.

Before LAY, Chief Judge, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL, and BEAM, Circuit Judges, en banc.

BOWMAN, Circuit Judge.

John A. Kroh, Jr. was convicted by a jury in District Court[1] of thirteen bank fraud charges: one count of conspiracy to submit false statements to federally insured banks, 18 U.S.C. § 371 (1988); three counts of making false statements to federally insured banks, 18 U.S.C. § 1014 (1988); four counts of causing interstate wire transmissions of money fraudulently obtained, 18 U.S.C. § 1343; four counts of interstate transportation of money in execution of a scheme to defraud, 18 U.S.C. § 2314 (1988); and one count of receiving and possessing money that had crossed state lines after having been unlawfully taken, 18 U.S.C. § 2315 (1988). Kroh was sentenced to concurrent maximum sentences on all counts, the longest of which was ten years. He appealed the convic-

[1]. The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

tions, asserting numerous grounds. A divided panel of this Court issued an opinion reversing all of Kroh's thirteen convictions, having determined that the admission of evidence of George Kroh's guilty plea was prejudicial error. *United States v. Kroh*, 896 F.2d 1524 (8th Cir.1990). The Court voted to grant the government's petition for rehearing en banc, thereby vacating the panel opinion, and we now affirm the convictions.

We adopt the panel opinion's detailed background statement of the facts of the case, 896 F.2d at 1526–28, with the exception of the statement concerning the practice of George Kroh's personal secretary in signing the name of Carolyn Kroh, George's wife, to personal guaranties: "Significantly, George Kroh's secretary testified this practice was directed by Mondschein or other company personnel and that George Kroh was never involved." 896 F.2d at 1528. In fact, the secretary testified that she signed Carolyn Kroh's name to guaranties either at George Kroh's direct request or because it was customary for her to do so. *See* 896 F.2d at 1539 n. 2 (dissenting opinion).

On appeal, Kroh challenges the following: (1) the application of 18 U.S.C. §§ 2314 and 2315 to his activities; (2) the admission of evidence of the guilty plea of George Kroh, John's brother; (3) the admission of evidence of an uncharged check kite; (4) the alleged constructive amendment of the indictment because of the variance between the indictment and the proof; (5) an alleged erroneous instruction; and (6) the sufficiency of the evidence on all counts. The panel found issue (1) to be without merit. We adopt the panel's reasoning, 896 F.2d at 1528–29, and reject that argument as well. We also adopt the panel's reasoning confirming the sufficiency of the evidence on all of the twelve substantive counts. 896 F.2d at 1526, 1529–30. We decline to accept the panel's opinion as to issue (2) and issue (6), to the extent the opinion rejects the sufficiency of the evidence of conspiracy, and we examine issues (3), (4), and (5) for the first time here.

Having disposed of the first issue, we turn to Kroh's claim that evidence of his brother's guilty plea was improperly received. On April 13, 1988, before John Kroh's September 1988 trial, George Kroh appeared before Judge Scott O. Wright in the United States District Court for the Western District of Missouri. He entered a guilty plea to bank fraud charges then pending against him in the Western District of Missouri and the District of Kansas, among which was a charge that he conspired with his brother John to defraud banks. John Kroh's defense counsel filed a pretrial motion in limine to suppress references to George Kroh's plea agreement and resulting convictions during John's trial. At the hearing on this motion, the prosecutor told the district judge he intended to question George Kroh on direct examination about George's plea agreement with the government and his convictions, but stated that the written plea agreement would not be offered as evidence. The district judge said he would not allow the written agreement into evidence, nor would he allow the prosecutor to read from it. The judge did indicate that he would permit questioning of George Kroh concerning his convictions and the plea agreement, and further questioning by the government if the defense opened the issue on cross-examination. Transcript Vol. I at 9–10.

It is important initially to set forth in full the only references during the trial to George Kroh's guilty plea. Such elaboration in context will demonstrate that the plea was not presented in an inflammatory way and was not unduly emphasized, and will provide the basis for properly applying the law to the facts of this case.

During the government's opening statement, the prosecutor told the jury:

George Kroh will testify, Jack's brother. George Kroh will come in here and tell you first of all, he will tell you that he has pleaded guilty to several charges involving banks, that he has pleaded guilty in connection with a plea bargain with me; and he will lay that out for you.

Transcript Vol. II at 78.

The prosecutor's statement did not mention that George Kroh was charged with or

pleaded guilty to conspiracy with his brother or anyone else. There was no objection by the defense.

During the government's direct examination of George Kroh, the government first established the witness's identity and his relationship to John Kroh and to Kroh Brothers Development Company (KBDC). The following exchange then took place:

Q: (by the government): All right, sir. And now, Mr. Kroh, you are appearing today as a result of a plea agreement with the United States, correct?

A: (by George Kroh): Yes, sir.

Q: And can you tell the members of the jury when it was that that plea bargain arrangement was reached, if you can recall?

A: Last spring sometime.

Q: Okay. And just to summarize it, if I may for you, and correct me if any of this is incorrect, but just summarizing that, that has been reduced to a pleading, correct?

A: That is correct.

Q: The agreement between you and the United States is in essence as follows, is it not. Your part of the agreement is that you came into Federal Court and pled guilty to three felony counts of bank fraud, correct?

[Defense objected. Bench conference at which defense counsel explained that he wanted to be certain the government did not go into George's agreement to tell the truth. If so, he would object. The prosecutor assured the judge he intended to stay within the limits delineated at the hearing on the motion in limine. The proceedings returned to open court.]

Q: Just so that we are back on track here. Mr. Kroh, the agreement is essentially that you came into Federal Court here and pled guilty to three counts of false statements to banks; isn't that essentially it?

A: Yes, sir.

Q: And one of those counts involved, I think, a conspiracy count, correct?

A: That is correct.

Q: And you did that and you also told the United States that you would cooperate with the Government in furtherance of its investigation in this matter, correct?

A: That's correct.

Q: And that cooperation included testifying before a federal grand jury, correct?

A: Yes, sir.

Q: And also testifying here?

A: Yes, sir.

Q: Okay. Now, in exchange for that, the United States has told you, first of all, that whatever cooperation you lend to it, it would tell the sentencing judge at the time of sentencing, correct?

A: That is correct.

Q: And it further told you that there would be a five-year cap or a lid on any sentence to be imposed in your case; isn't that true?

A: That is correct.

Q: Now, does that fairly summarize what the agreement was between you and the United States?

A: Yes, it does.

Q: All right. Did you, in fact, plead guilty to those charges?

A: I did.

Q: Were you sentenced?

A: Yes, sir.

Q: Can you tell us what your initial sentence was?

A: Two three-year sentences, running concurrently.

Q: Okay. And that was imposed by Chief Judge Wright of this district?

A: That is correct.

Q: Was that sentence subsequently reduced?

A: Yes, sir.

Q: And can you tell us—did you actually go off and do time?

A: Yes, I did.

Q: Was it reduced to what, sir?

A: Sixty days.

Q: Was there anything else provided as a reduction of that sentence?

A: Five years probation.

Q: And any other caveats to that sentence?

A: Yes. A restitution to the two banks.

Q: Which banks are those, Mr. Kroh?

A: Norbank and Kansas National.

Q: You are also appearing today in relationship to an immunity agreement that the United States has gotten and you have been provided with, correct?

A: That is correct.

Q: And essentially that immunity agreement is that whatever you say we can't turn around and use against you, right?

A: That's correct.

Q: In other words, your Fifth Amendment right is no longer applicable in this case?

A: Yes, sir.

Transcript Vol. V at 780–84.

The conspiracy charge was mentioned specifically only once and, in fact, a plea of guilty to conspiracy *with John Kroh* was never mentioned in this exchange. The reference was quite obviously in the context of setting out the entire agreement, and was not emphasized.

George Kroh's testimony was preceded by this limiting instruction, which also was read without material alteration as Instruction 22 at the close of all the evidence:

Ladies and gentlemen of the jury, before we begin the testimony of this witness, I have an additional instruction to read to you. You are going to hear evidence from the witness, George P. Kroh, who you will hear evidence that he has made a plea agreement with the Government. You may give his testimony such weight as you think it deserves. Whether or not his testimony may have been influenced by the plea agreement is for you to determine.

The witness' guilty plea cannot be considered by you as evidence of this defendant's guilt. The witness' guilty plea can be considered by you only for the purpose of determining how much, if at all, to rely upon the witness' testimony.

Transcript Vol. V at 776–77; *see also* Vol. VII at 1269.

Finally, the government explored George Kroh's guilty plea further on redirect examination. This was invited by the following testimony on cross-examination:

Q: (by defense counsel): Is it also correct to say that you never agreed with Jack to make a false statement on a balance sheet?

A: (by George Kroh): Do you mean like we sat down together and agreed?

Q: Right.

A: I would say that's—we didn't sit down and write something up, no.

Q: Nor did he come to you and say, "Jack [sic], I am going to file a false financial statement on your behalf"?

A: No.

Q: And you had no knowledge of him having done so until after the fact?

A: That's correct.

Q: You and Jack never agreed to defraud any bank, did you?

A: Again, we didn't sit down and draw up an agreement and sign some agreement that we were going out to defraud banks, no, sir.

Transcript Vol. V at 875–76.

On redirect, the prosecutor and witness had this exchange:

Q: (by the government): Mr. Kroh, you were asked some questions about do you agree with your brother to submit false financial statements to banks. I understand that you responded you didn't sit down and draw up an agreement with them. But isn't it true, Mr. Kroh, that you came in here to Federal Court and pled guilty to that charge?

A: (by George Kroh): Yes, sir.

[Defense counsel objected. Bench conference. Objection overruled.]

Q: Mr. Kroh, you came in here to Federal Court and appeared before Chief Judge Scott O. Wright, correct?

A: That's correct.

Q: And at that time you were placed under oath, correct?

A: Yes, sir.

Q: And at that time you tendered a guilty plea to conspiring with your

brother over here to submit false statements to banks, right?

A: That's correct.

Q: And—

[Objection renewed. Bench conference and motion for mistrial. Denied.]

Transcript Vol. V at 878–82.

That was the full extent of the discussion of George Kroh's guilty plea on redirect examination. It never was mentioned again, either in closing argument or otherwise. There are no other references to George Kroh's plea agreement or his convictions anywhere in the evidence the jury heard during the six days of trial.

■ "The trial court has broad discretion in determining what evidence can be admitted, and its decision will be overturned on appeal only if there was an abuse of discretion." *Rothgeb v. United States*, 789 F.2d 647, 650 (8th Cir.1986). The discretion accorded lower courts in determining admissibility of evidence "is particularly broad in a conspiracy trial." *United States v. Davis*, 882 F.2d 1334, 1343 (8th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1472, 108 L.Ed.2d 610 (1990). The District Court stayed well within its discretion in allowing the government to question George Kroh on direct and redirect examination about his plea agreement and convictions.

■ In the Eighth Circuit, the law is clear that "a confederate's guilty plea is admissible, *even on the Government's direct examination of the witness*, as evidence of the witness' [sic] credibility, or of his acknowledgment of participation in the offense." *United States v. Hutchings*, 751 F.2d 230, 237 (8th Cir.1984) (emphasis added) (witness testified on direct examination about his plea of guilty to aiding and abetting defendant in crime with which defendant was charged), *cert. denied*, 474 U.S. 829, 106 S.Ct. 92, 88 L.Ed.2d 75 (1985). The witness's plea or evidence thereof, however, "cannot be used as substantive evidence of the defendant's guilt," and the jury should be so instructed. *Id.; see also*

*United States v. Drews*, 877 F.2d 10, 12 (8th Cir.1989) (no abuse of discretion in receiving witness-coconspirators' *written* plea agreements into evidence when jurors were instructed that pleas were not evidence of substantive guilt of defendant but only went to credibility of witnesses, and government did not indicate "it had independently verified the witnesses' testimony"); *United States v. Braidlow*, 806 F.2d 781, 783 (8th Cir.1986) (no error in admitting evidence of guilty pleas of confederates on direct examination when the evidence was not used as substantive evidence of defendant's guilt, cautionary instructions were given, and evidence was not emphasized).

The evidence of George Kroh's guilty plea brought out on direct examination clearly was admissible under the law of this Circuit. The written plea agreement was not offered in evidence, nor was any part of the text read to the jury. The government focused only on the fact of the guilty plea and the quid pro quo involved in George's agreement with the government. The prosecutor did not even mention that the conspiracy to which George Kroh pleaded guilty was a conspiracy with John Kroh and, in any event, the District Court instructed the jury twice that evidence of George's plea was not to be interpreted as evidence of John's guilt, but was to be used only in determining the weight to be given to George's testimony. The charges to which George pleaded guilty played only a small part in his direct examination and certainly were not emphasized by the government. Neither the guilty plea nor the agreement was mentioned in the prosecutor's closing argument; the government relied on neither for its proof of John's participation in a conspiracy. The District Court plainly did not abuse its discretion in allowing this direct testimony.[2]

■ There remains the question whether the guilty plea was emphasized to John Kroh's prejudice on the government's redirect examination of George Kroh. It is

---

**2.** In the event the defense intended the continuing objection it made following the hearing on the motion in limine to cover the reference to

the plea bargain in the government's opening statement, the same reasoning applies and there is no error in the opening statement.

clear from the record that on redirect the government properly used George Kroh's guilty plea for impeachment purposes. On cross-examination, the defense asked George if he had agreed with John to defraud banks. George's denial, though equivocal, opened the door for the government to impeach that testimony. "The trial court does not abuse its discretion by allowing the use of evidence on redirect examination to clarify an issue that was opened up by the defense on cross-examination—even when this evidence would otherwise be inadmissible." *Braidlow*, 806 F.2d at 783. On cross-examination, George Kroh testified "no agreement," but his guilty plea was to the contrary. The guilty plea already had been mentioned in another context, was clearly probative of the credibility of George's testimony denying that he had agreed with John to defraud banks, and was not unfairly prejudicial. It is also a reiterated "acknowledgment of participation in the offense," which participation George was attempting to deny. *Hutchings*, 751 F.2d at 237. In these circumstances, it was proper for the government to ask George Kroh on redirect examination whether he had pleaded guilty to conspiracy with his brother to submit false statements to banks. Defense counsel opened up this line of questioning and the government was entitled to pursue it to show that George had been less than candid in his answers on cross-examination.

■ John Kroh argues that, because there was no other evidence of his participation in a conspiracy with George, the jury must have disregarded the District Court's limiting instructions and used George's guilty plea as evidence of John's guilt. A review of the transcript demonstrates, however, that there is substantial evidence of John Kroh's participation in a conspiracy with George Kroh to defraud banks. While much of the evidence is circumstantial, "[t]he independent evidence showing a conspiracy may be direct or totally circumstantial." *United States v. Jankowski*, 713 F.2d 394, 396 (8th Cir. 1983), *cert. denied*, 464 U.S. 1051, 104 S.Ct. 732, 79 L.Ed.2d 192 (1984).

■ It is the well-established rule in this Court that, in our review of a criminal conviction, the evidence must be viewed in the light most favorable to sustaining the jury verdict, giving the government the benefit of all reasonable inferences that may be drawn. *United States v. Marin–Cifuentes*, 866 F.2d 988, 992 (8th Cir.1989).

The former personal secretaries of John and George Kroh, and George Kroh himself, all testified that the liability figures on the brothers' personal financial statements were supplied by John Kroh. Evidence from several witnesses demonstrates that those liabilities were significantly understated. The individual false financial statements were signed by John and George Kroh and sent to the defrauded banks to obtain personal loans.

In May 1986, John Kroh represented to Southwest Bank of Omaha that he wanted a total of half a million dollars in personal loans for himself and his brother for a "personal investment" with a New York investment firm. Southwest, upon reviewing the false personal financial statements, approved the loans and, after John and George Kroh signed promissory notes, wired the funds to the brothers' personal accounts. John and George promptly signed personal checks transferring the money into a KBDC account.

In October 1986, on John's representation that the funds were to be used for personal investments in the Hall Farms project, the Krohs applied for a combined one million dollars in personal loans from Norbank of North Kansas City. After receiving and reviewing the false personal financial statements signed by John and George Kroh, the bank approved the loans. Norbank also required personal guaranties of the brothers' wives, but the guaranties furnished to the bank upon which it relied were in fact signed by the brothers' secretaries and not their wives. After signing the promissory notes, John and George Kroh received and deposited in their personal accounts the money orders for the loans and immediately signed checks for the loan amounts made payable to KBDC, which by now, it was clear to all on the

inside, was having very serious cash-flow problems.

Finally, again upon the representation that the funds were for personal investment in Hall Farms, the brothers submitted false personal financial statements and consequently acquired personal loans totalling $800,000 from Firstate Savings & Loan of Orlando in November 1986. They immediately transferred the proceeds of these personal loans into the sinking ship that KBDC had become.

It is obvious from the evidence that John Kroh, in a desperate scheme to keep KBDC afloat, was knowingly defrauding banks and that George Kroh was actively participating in the fraudulent scheme. As for the conspiracy, that is, George Kroh's knowing involvement in the unlawful activity, his own testimony is particularly damning.

On direct examination:

Q: (by the government): When did it become apparent to you that Kroh Brothers Development Company was in financial trouble in 1986?

A: (by George Kroh): In August. That was the first time.

Q: Why is that? Why did it hit you in August?

A: There were some problems paying the bills.

\* \* \* \* \* \* \*

[Discussing George Kroh's personal financial statement that was sent to Norbank.]

Q: In October of 1986, can you tell me whether or not the $3.3 million accurately reflected the total liabilities that you had?

A: I don't believe it did.

Q: Can you tell me back then what you thought your liabilities were?

A: I thought they were about $5 million.

\* \* \* \* \* \*

Q: Okay. And in connection with this financial statement that went to the Firstate Savings & Loan, can you tell me whether or not back in November

of 1986, $3.3 million accurately reflected your bank liabilities?

A: No, it did not.

Q: Why do you say that, sir?

A: Well, I had more than that borrowed.

Q: Do you remember at that time how much you thought that you had owed to banks?

A: I thought it was around five, five and a half million.

Transcript Vol. V at 800, 822–23, 828.

On cross-examination:

Q: (by defense counsel): Do you believe that the—that if this, say the American Express and the institutional deals that you had working, if they had gone through, do you think that it would have made a difference in the ultimate outcome relative to Kroh Brothers?

A: (by George Kroh): It might have slowed it down a little bit, but I don't think it would have made an ultimate decision of whether the company would have gone down or not.

Q: Do you think that that ultimately would have taken place in any event?

A: I am afraid so.

Q: All right. There was some kind of an inherent defect in the operation; is that what you are saying?

A: No, I think it was too late. You asked if these would happen—if a closing or two in December or November of '86 would have helped out. I am saying I think it was too late at that point.

\* \* \* \* \* \*

Q: Would it be correct to say, Mr. Kroh, that you never knowingly signed a false financial statement?

A: I would say that's—well, up until the very end. I'd say up through—after Commerce Bank there might have been a question.

Q: There was a question?

A: *After Commerce Bank I did.*

Transcript Vol. V at 845–46, 874–75 (emphasis added).

After the Commerce Bank check-kiting debacle[3]—the day after, in the case of Norbank—George and John Kroh each signed false financial statements omitting, among other liabilities, the personal guaranties for seven million dollars they just had given to Commerce, and used those false statements to procure loans (that they knowingly misrepresented as being for their personal use rather than their financially troubled company's use) from two of the banks in question. While defense counsel attempted to cure George's damaging testimony, it is, in fact, an admission of guilt that the jury could have credited.

Although it may be true that George was not involved in the negotiations for the loans or the preparation of the personal financial statements, he signed the financial statements knowing them to be false, signed promissory notes for personal loans, and then signed checks transferring the proceeds of the loans to KBDC, knowing full well that KBDC as an entity had lost its ability to borrow and that it was headed for financial disaster. "Secrecy and concealment are essential features of successful conspiracy.... Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947) (footnote omitted).

It simply cannot be said that there is no evidence of a George–John conspiracy, as Kroh alleges. Only a minimum of evidence would be required to connect George and John in a conspiracy, and here there is substantial circumstantial evidence of a conspiracy between the brothers sufficient to convict John Kroh of the conspiracy charge. There is also George's highly equivocal quasi-denial of his involvement in a conspiracy with John, *supra* at 330, from which the jury was entitled to draw its own inferences. Considering the strength of the evidence of a conspiracy between

George and John, there is simply no reason to speculate, as John Kroh asks us to do, that the jury must have disregarded the District Court's repeated instructions not to consider George's guilty plea as evidence of John's guilt. We hold that the other evidence, independent of George's guilty plea, is sufficient to support John Kroh's conspiracy conviction, and that the government's references to George's guilty plea, which we believe were proper, afford no basis for reversing this conviction.

■ Kroh argues that the evidence of George Kroh's guilty plea "infected the fairness of Jack Kroh's trial as to each count." Appellant's Brief at 38. But even assuming *arguendo* the validity of this argument as applied to the conspiracy count, we could not agree that the three fleeting and entirely proper references to George Kroh's guilty plea, presented for the purpose of assisting the jury in its evaluation of George's testimony and not as substantive evidence of John's guilt, prejudiced John's right to a fair trial on the remaining twelve counts. As the panel opinion acknowledged, there was sufficient evidence, viewed in the light most favorable to the government, to support Kroh's convictions on all of those twelve counts. *Kroh*, 896 F.2d at 1526, 1529–30. Were the admission of George Kroh's guilty plea reversible error as to the conspiracy count, and we hold that it was not, it would be harmless error at most as to the remaining counts, considering the overwhelming evidence of John Kroh's guilt on these counts.

These counts were all based on specific, limited, and discrete factual charges such as the making of false statements to banks as to liabilities, as to his wife's having signed guarantee documents, and as to the use of proceeds for personal investments rather than for KBDC; transmission of interstate wire communications in a scheme to defraud banks; and moving across state lines by wire transfers sums of money known to be taken by fraud. For the most part, the specific facts involved in these charges were not contested on appeal, with

---

**3.** For a review of the evidence regarding this incident, see *Kroh,* 896 F.2d at 1527.

the exception of intent and the claim that the government had failed to prove that Kroh stated that his wife had signed the Norbank guarantee. The specific and narrow facts in these counts in no way could have been affected by the references to George Kroh's guilty plea, and John Kroh was not prejudiced thereby with respect to these counts. It is also significant that Kroh was sentenced to ten years on each of the four counts involving knowingly transporting across state lines money taken by fraud, whereas he received only a concurrent two-year sentence on the conspiracy count.

As mentioned at the outset of this opinion, Kroh also challenges the admission of evidence of the Commerce Bank check kite, *see Kroh*, 896 F.2d at 1527, as being of questionable relevance and unquestionable prejudice; and the alleged constructive amendment of the indictment because the proof did not match the charges. We have considered these arguments and find them to be without merit.

█ Finally, Kroh challenges five of the jury instructions, which directed that the jury "must"—instead of "may"—find Kroh guilty if it found the prosecution had proved all the statutory elements of the crimes charged. Kroh is on the record as challenging only one of those five instructions for that reason. Transcript Vol. VII at 1247–48. The objections now asserted as to the remaining four were not preserved for appeal, so we will review those instructions only for plain error. *See United States v. Turner*, 725 F.2d 1154, 1158 (8th Cir.1984).

We find that the instructions as given constitute no error of any kind. Kroh says the District Court should have used the suggestive "may" language he requested rather than the mandatory "must" language in the instructions, presumably to give the jury the option of nullifying the applicable statutes. Jurors take an oath wherein they assume a duty to apply the law of the case to the facts, and the jurors here also were so instructed. Transcript Vol. VII at 1254. "Although jurors may indeed have the power to ignore the law,

their duty is to apply the law as interpreted by the court and they should be so instructed." *United States v. Krzyske*, 836 F.2d 1013, 1021 (6th Cir.) (quoting *United States v. Avery*, 717 F.2d 1020, 1027 (6th Cir. 1983), *cert. denied*, 466 U.S. 905, 104 S.Ct. 1683, 80 L.Ed.2d 157 (1984)), *cert. denied*, 488 U.S. 832, 109 S.Ct. 89, 102 L.Ed.2d 65 (1988); *see also United States v. Drefke*, 707 F.2d 978, 982 (8th Cir.) ("federal courts have uniformly recognized the right and duty of the judge to instruct the jury on the law and the jury's obligation to apply the law to the facts"), *cert. denied*, 464 U.S. 942, 104 S.Ct. 359, 78 L.Ed.2d 321 (1983). Having reviewed the instructions as a whole, we are convinced the court properly advised the jurors in this case that the determination of John Kroh's guilt was theirs alone, and that the instructions at issue did not usurp the jury's role. *See* Instruction No. 26, Transcript Vol. VII at 1271 ("Your verdict must be based solely on the evidence and on the law which I have given you in my instructions. Nothing I have said or done is intended to suggest what your verdicts should be. That is entirely for you to decide.").

The judgment of the District Court is affirmed.

LAY, Chief Judge, with whom McMILLIAN and MAGILL, Circuit Judges, join, dissenting.

The fundamental premise upon which any criminal conviction must necessarily stand is that the accused receives a fair trial governed by fair procedures. This concept is rooted in English common law and guaranteed under the Constitution of the United States.

John A. Kroh has been convicted of thirteen counts relating to bank fraud and sentenced to prison for ten years. He was denied a fair trial.

I.

The majority condones the principle that when a defendant is charged with conspiracy the government may in its case-in-chief offer a guilty plea of a co-conspirator, even

though the plea necessarily implicates the defendant, as long as the trial judge gives a cautionary instruction. The cautionary instruction informs the jury that the plea is not to be considered as substantive evidence of a defendant's guilt but only goes to the witness's credibility. The unfairness of such a superficial analysis obliterates any reasonable sense of fairness. This is particularly true when the obvious purpose of the government is not to adduce factual evidence of the conspiracy nor to supply other needed evidence, but simply to bring to the jury's attention the guilty plea of the alleged co-conspirator of the defendant. This court now allows the prejudicial use of the guilty plea without any exacting analysis of the government's tactic in calling an alleged co-conspirator for the primary purpose of eliciting the guilty plea.

As the Third Circuit observed over forty years ago, common sense dictates that "a plea of guilty by an alleged fellow conspirator is highly relevant upon the question of the guilt of another alleged coconspirator." *United States v. Toner,* 173 F.2d 140, 142 (3d Cir.1949).[1] This "logically probative" evidence of guilt, however, should be excluded for policy reasons:

> The foundation of the countervailing policy is the right of every defendant to stand or fall with the proof of the charge made against him, not against somebody else. Acquittal of an alleged fellow conspirator is not evidence for a man being tried for conspiracy. So, likewise, conviction of an alleged fellow conspirator after a trial is not admissible as against one now being charged. The defendant had a right to have his guilt or innocence determined by the evidence presented against him, not by what has happened with regard to a criminal prosecution against someone else.

*Id.* (footnotes omitted).

Despite the potential prejudice to defendants, federal courts have generally recognized that when a witness testifies for the government, the government may in narrow circumstances question the witness on direct examination about a guilty plea or plea agreement. The balancing justification for this is to allow the prosecution to blunt expected defense cross-examination about possible witness bias and to prevent the jury from forming an unjustified impression that the prosecution is concealing the plea agreement. *See e.g., United States v. Edwards,* 631 F.2d 1049, 1051–52 (2d Cir.1980). All courts that have considered the question, however, hold that the jury may not use the guilty plea as substantive evidence of the defendant's guilt. *See, e.g., United States v. Dworken,* 855 F.2d 12, 30–31 (1st Cir.1988); *United States v. Wiesle,* 542 F.2d 61, 62 (8th Cir. 1976).

When the prejudice to the defendant may be great, such as in the case of a guilty plea of a co-conspirator, the law requires additional safeguards to ensure that the government does not offer such evidence for an improper purpose and the jury does not use such evidence improperly. Courts have recognized that "reference to the guilty pleas of [the] defendant's alleged coconspirators, in the very case in which the defendant is then standing trial, is obviously capable of prejudicing his trial." *United States v. Handly,* 591 F.2d 1125, 1128 n. 1 (5th Cir.1979). Courts have found that such an instance occurs when a co-defendant or co-conspirator's guilty plea *necessarily* implicates the defendant. *United States v. Harrell,* 436 F.2d 606, 617 (5th Cir.1970); *United States v. Hutchings,* 751 F.2d 230, 239 (8th Cir.1984) (McMillian, J., specially concurring), *cert. denied,* 474 U.S. 829, 106 S.Ct. 92, 88 L.Ed.2d 75 (1985).

One well-recognized safeguard against such unfair prejudice is the use of a cautionary instruction that directs the jury not to use the co-offender's guilty plea as substantive evidence of the defendant's guilt. The majority opinion makes much of the fact that the trial judge in this case gave such an instruction. *See* Majority Opinion at 330, 331–32, 334. A cautionary instruction alone however, can hardly prevent an

---

1. As Judge Goodrich cogently observed: "If A's admission that he conspired with B is believed it is pretty hard to avoid the conclusion that B must have conspired with A." *Id.*

unfairly prejudicial trial.[2]  It is an inescapable fact that in certain cases jurors are incapable of ignoring highly prejudicial evidence, particularly when they have little other evidence to rely on.  "The naive assumption that prejudicial effects can be overcome by instructions to the jury all practicing lawyers know to be unmitigated fiction."  *Krulewitch v. United States*, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Jackson, J., concurring).  *See also Bruton v. United States*, 391 U.S. 123, 129, 88 S.Ct. 1620, 1624, 20 L.Ed.2d 476 (1968) ("[T]oo often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors") (quoting *Della Paoli v. United States*, 352 U.S. 232, 247, 77 S.Ct. 294, 302, 1 L.Ed.2d 278 (1957) (Frankfurter, J., dissenting)).  Given the lack of other probative evidence establishing John Kroh's guilt on the conspiracy charge, this case demonstrates an instance when even "the strongest corrective instruction would be insufficient" to erase the prejudicial effect to the defendant.  *United States v. Richardson*, 504 F.2d 357, 360 (5th Cir. 1974), *cert. denied*, 420 U.S. 978, 95 S.Ct. 1406, 43 L.Ed.2d 659 (1975) (quoting *United States v. Baete*, 414 F.2d 782, 783–84 (5th Cir.1969)); *United States v. Harrell*, 436 F.2d at 617.  *See also United States v. Miranda*, 593 F.2d 590, 595–96 (5th Cir. 1979) (doubtful that any curative instruction could have erased prejudice from the minds of jurors resulting from improperly used guilty plea of co-conspirator).

The Third Circuit has explained the special case presented by a conspiracy trial:

The guilty plea to a conspiracy charge carries with it more potential harm to the defendant on trial [i.e. more potential harm than a guilty plea to a substantive count] because the crime by definition requires the participation of another. The jury could not fail to appreciate the significance of this.... A plea by a co-conspirator thus presents a unique sit-

uation which may require the courts to scrutinize more closely the purported remedial effect of instructions to the jury. *United States v. Gullo*, 502 F.2d 759, 761 (3d Cir.1974).

In discussing these judicially created safeguards aimed at preventing unfair prejudice to defendants, the Ninth Circuit has stated that "both trial *and* reviewing courts have responsibility to insure that evidence of the [guilty] plea is being offered by the prosecutor and used by the jury *only* for a permissible purpose." *United States v. Halbert*, 640 F.2d 1000, 1005 (9th Cir.1981) (per curiam) (emphasis added).  Further, the Fifth Circuit has observed that in evaluating the prosecution's use of a witness's guilty plea:

"[W]e must carefully examine all the facts and circumstances of the case in their proper context.  The presence or absence of [a limiting] instruction is an important factor, *but it is also essential to consider other factors, such as whether there was a proper purpose in introducing the fact of the guilty plea, whether the plea was improperly emphasized or used as substantive evidence of guilt, [and] whether the introduction of the plea was invited by the defense counsel....*"

*United States v. Fleetwood*, 528 F.2d 528, 532 (5th Cir.1976), (*quoting United States v. King*, 505 F.2d 602, 608 (5th Cir.1974)) (emphasis added).  *See also United States v. Casto*, 889 F.2d 562, 567 (5th Cir.1989) (same), *cert. denied*, —— U.S. ——, 110 S.Ct. 1164, 107 L.Ed.2d 1067 (1990).

Another judicial safeguard aimed at eliminating possible prejudice to the defendant in these situations is for the district court to use a motion *in limine* before trial begins.  When the defendant agrees in such a motion not to question the government's witness about the guilty plea or plea arrangement or to use the plea to impeach the witness's credibility, then the government is left with no legitimate pur-

---

**2.** The trial judge had little choice in whether to give the cautionary instruction as it would have been reversible error for the judge to withhold it.  *See, e.g., Bisaccia v. Attorney General of New*

*Jersey*, 623 F.2d 307, 309 (3d Cir.1980); *United States v. Wiesle*, 542 F.2d 61, 62 (8th Cir.1976); *United States v. Harrell*, 436 F.2d 606, 617 (5th Cir.1970).

pose in using the guilty plea during direct examination. *See* S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 469 (4th ed. 1986).

John Kroh was not provided these important safeguards. In his pretrial motion *in limine,* he vigorously objected to the government's plan to elicit from George Kroh that George had pleaded guilty to a conspiracy to defraud banks. Although John Kroh specified that the defense would not attack George Kroh's credibility or in any way refer to the plea agreement with the government, the trial judge allowed the government in its case-in-chief to question George—the only named co-conspirator in the case—about his plea. The impact on the jury could not have been anything short of devastating.[3]

Far more troubling than the trial court's decision to allow the government to question George Kroh about his guilty plea in the first instance is the majority's ready acceptance of the government's superficial explanation that it had a legitimate motive for using the guilty plea. *Cf. United States v. Fleetwood,* 528 F.2d 528, 533 (5th Cir.1976) (close scrutiny reveals that there was no proper purpose for government to offer guilty plea); *United States v. Calafati,* 569 F.Supp. 50, 52 (E.D.Penn.1983) (same). The majority fails to show what the Fifth Circuit describes as their "deep sensitivity to the possibilities of prejudice caused by allowing a jury in a criminal case to consider evidence of a co-defendant's guilty plea." *United States v. Richardson,* 504 F.2d 357, 360 (5th Cir.1974), *cert. denied,* 420 U.S. 978, 95 S.Ct. 1406, 43 L.Ed.2d 659 (1975). "What may facially appear as a legitimate introduction of evidence of a plea becomes something else and on the level of prejudicial error when ... offered as substantive evidence of [the defendant's] guilt." *United States v. Halbert,* 640 F.2d 1000, 1005 (9th Cir.1981) (per curiam). I believe the record, taken as a whole, clearly shows that the government offered George Kroh's guilty plea as evidence of the defendant's guilt.

Of significance here is that the government's direct examination of George Kroh did not disclose any evidence of a scheme between him and his brother to defraud banks.[4] The only evidence of the conspiracy the government could put before the jury in their case-in-chief was that John's brother had pleaded guilty to the same conspiracy. The obvious inference is that the government was primarily interested in introducing George's plea as evidence of John Kroh's guilt, an improper purpose. *Cf. United States v. Miller,* 664 F.2d 94, 97 (5th Cir. Unit B 1981) (prosecutor may not introduce evidence for the *primary* purpose of placing before the jury substantive evidence otherwise inadmissable), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982).

Obscuring the fact that the government had no legitimate motive for bringing out George Kroh's guilty plea, the majority takes great pains to show that the government's use of that plea was limited. The government argues that it was careful not to reveal in its case-in-chief that John's co-conspirator was actually his brother George. It argues that there was another unnamed co-conspirator, Mondschein, and therefore the jurors would not know (until redirect) that George's conspiracy plea necessarily implicated the defendant. If we

---

**3.** As Judge Weinstein has pointed out:
The impact on the jury [of the government bringing out the guilty plea of a co-offender] is quite substantial: the obvious inference is that if one of several persons alleged to be co-offenders pleads guilty and exposes himself to imprisonment, he must have been telling the truth, and if one is guilty, all are guilty. 2 J. Weinstein & M. Berger, Evidence ¶ 410[07] at 410–49 (1988).

**4.** On appeal, the government apparently concedes that it did not call George Kroh to establish evidence of a conspiracy between him and his brother. In its brief, the government points to seven reasons George was called, none of them being to testify about any agreement between the two brothers. (G. Brief, p. 37). As the defendant points out, the seven matters that the government ostensibly did call George to testify about were undisputed or uncontradicted by the testimony of other witnesses. (D. Reply Brief, p. 13). Even a cursory perusal of the transcript of George's trial testimony demonstrates that his testimony was not helpful or necessary to the government's case.

believe in this, we believe in tooth fairies. How strange that the government not once in the district court mentioned Mondschein to the jury or to the trial court as a co-conspirator. Never once in its final argument did it mention Mondschein as a co-conspirator. The only co-conspirator the government zeroed in on was George Kroh, because it had a guilty plea from George which directly provided the facile and prejudicial evidence of the defendant's alleged scheme to defraud the three banks. The majority's argument overlooks the government's concession that even before the opening statements, the trial court read the indictment which stated that John Kroh had been charged with his brother George for conspiracy to commit bank fraud.[5] The fact that it "takes two to tango" in a conspiracy could not have escaped the jury's attention. *United States v. Gullo*, 502 F.2d 759, 761 (3d Cir.1974). Thus from the outset the jurors were aware that George already had pleaded guilty to conspiring with the defendant to defraud the three banks.[6] This, of course, was the same crime for which John Kroh was now standing trial.

By the time of redirect, the government's questioning about the plea was simply icing on the cake. The government nonetheless wasted no time in once again informing the jury on redirect that George had pleaded guilty to conspiring with his brother John to defraud several banks. The government accomplished this under the guise of impeachment. After uneventful direct testimony by George, the defense attorney elicited equivocal answers from him tending to show that there had been no agreement between George and the defendant to defraud banks. During redirect examination, the prosecutor for the third time highlighted George's guilty plea, specifically pointing out that George had pleaded guilty to conspiring *with his brother, the defendant in the present Action.* (Tr. Vol. V. at 880; Majority Opinion at 330).

The government thus wants to have it both ways. The government initially claims it wanted to use the plea of George to bolster his credibility before the defense could attack it, knowing the defendant had already informed the court that he would not use the plea to impeach George. Yet, in the planned finale, the entire plea was brought out on redirect as impeachment. Under these circumstances, to urge that the government's planned motive was not to use the plea as substantive evidence ignores the reality of prosecutorial overkill in the real world. This Court's endorsement of the government's strategy undermines the basic right of the defendant to have his guilt determined upon the evidence against him, not on whether a co-offender pleaded guilty to the same charge. *See United States v. Fleetwood*, 528 F.2d 528, 532 (5th Cir.1976).

## II.

The majority would have us believe that even without the evidence of George Kroh's guilty plea, the government presented the jury with sufficient evidence of a conspiracy between the two brothers. I disagree. In attempting to show that there was other evidence of the conspiracy between George and John Kroh, the majori-

**5.** The indictment began:

Beginning on or about May 1, 1986, and continuing to on or about January 29, 1987 ... John A. Kroh, Jr., and George P. Kroh did unlawfully, knowingly, and willfully conspire and agree with each other, and with others known and unknown to the grand jury, to commit an offense against the United States ... by making and causing to be made false statements of material facts to influence the actions of banks and other financial institutions
....

In this, the conspiracy count of the indictment, George Kroh was named *ten additional times* in connection with alleged illegal activities with his brother John. Subsequent counts of the indictment mentioned George Kroh six additional times.

**6.** In *Gullo*, the prosecutor's questioning and statements had not specifically informed the jury that the co-conspirator had pleaded guilty to a conspiracy with the defendant. The court, however, correctly reasoned that the jury could infer from the indictment—which listed both the defendant's and the co-conspirator's names—that the co-conspirator had pleaded guilty to conspiring with the defendant. *Gullo*, 502 F.2d at 761 n. 3.

ty goes to great lengths to quote portions of the transcript. In all due respect, the selective editing of the testimony omits those portions that demonstrate George Kroh's complete isolation from the defendant's loan activities. For example, George stated he did not involve himself *at all* in the financial aspects of KBDC (Tr. Vol. V at 794); that he could only "assume" what the defendant did with his (George's) signed financial statements (Tr. Vol. V at 798); that he did not know, in August, 1986, what their associate Mondschein was doing to deal with the cash flow problems (Tr. Vol. V at 801); that he did not know anything about the Southwest Bank loan (Tr. Vol. Vol. V at 812–13); that he did not know about the Norbank loan, or using the loan proceeds for the Hall Farm project (Tr. Vol. V at 821–22); and that he did not know anything, in November, 1986, about the Firstate Savings loan (Tr. Vol. V at 827). Although George Kroh's secretary had been authorized to sign his wife's name in the past, George did not know who signed his wife's name to the Norbank guaranty, and did not have anything to do with getting the guaranty signed (Tr. V at 825–26).

George Kroh did not testify to any contemporaneous knowledge of a scheme to defraud banks, but only gave a hindsight analysis of the events.[7] George's knowledge of KBDC's financial difficulties is not evidence of an illegal agreement with his brother John to defraud banks. Such an agreement is crucial to a finding of a conspiracy. *See, e.g., United States v. Austin,* 823 F.2d 257, 259 (8th Cir.1987), *cert. denied,* 484 U.S. 1044, 108 S.Ct. 778, 98 L.Ed.2d 864 (1988). George testified that his response to the financial crisis was to push harder on rent collections and equity sales (Tr. Vol. V at 801, 810), not to engage in a conspiracy to defraud banks. In light of this testimony, it is difficult for me to understand the majority's argument that the government did not rely on George's guilty plea for proof of the conspiracy.

One may argue that George's factual denials of a conspiracy with his brother to defraud banks did not have to be believed by the jury. This is true. The government guaranteed that by producing his guilty plea in their case-in-chief. Lack of credibility, however, does not establish affirmative evidence. Surely the inference from a negative statement does not prove the positive. The acknowledgement, emphasized in the majority opinion, that George signed false statements after the Commerce Bank incident is taken completely out of context. This acknowledgement is made after the fact and does not in any way contradict the undisputed evidence of George's non-involvement.

Even assuming, however, that there exists some scintilla of evidence or bare inference that shows George conspired with the defendant, the mere paucity of it all, and the strain to reach such a conclusion, clearly demonstrates the prejudice caused by the use of George's guilty plea.

The majority now suggests that any prejudice was harmless error because there was such overwhelming evidence of John Kroh's guilt, especially on the substantive counts. Once again, the doctrine of harmless error is elevated to override constitutional fairness. This essentially overlooks the maxim that the jury is the trier of fact and the sole judge of credibility. John Kroh raised a credibility defense to his actions. Without the unfairly prejudicial guilty plea of his brother, it is certainly within the realm of reason to say that reasonable jurors could have found a reasonable doubt as to his guilt on both the conspiracy and the substantive counts. The admission of George Kroh's guilty plea tainted the entire trial. *See United States v. Calafati,* 569 F.Supp. 50, 53–54 (E.D. Penn.1983) (Pollack, J.) (despite government's "very, very strong case" against defendant, admitting co-conspirator's guilty

---

7. *See* quoted portions of George's testimony Majority Opinion at 333 (Tr. Vol. 5 at 845–46, 874–75). Contrary to the majority's assertion, this testimony does not evidence contemporaneous knowledge. Any doubt was resolved on cross examination when George Kroh stated that he had no knowledge that John had filed false financial statements on his behalf "until after the fact." *See* Majority Opinion at 330 (quoting transcript Vol. V at 875–76).

plea was so prejudicial as to require new trial).

John Kroh claimed he was not responsible for the understated liabilities.[8] His claim was supported by the testimony of an independent CPA who worked on KBDC matters, who testified that she received pertinent personal financial information from the accounting department employees. The defendant also correctly points out that the format of the personal financial statements, designed by a former employee, did not accurately account for all liabilities within the liability section.[9] Thus John Kroh's testimony at trial, if believed, supports his claim that he was relying on the asset and liability figures that others were responsible for updating.

The defendant contends he did not misrepresent to the banks how the loan proceeds would be used. He informed Southwest Bank that the loan proceeds were for a "personal investment," and later suggested the funds were for an investment with "Herb Allen." Southwest Bank's documentation noted only "personal investment" as the purpose of the loan. The defendant contends, and the bank official testifying agreed, that placing the money in his largest asset, KBDC, was a personal investment. The bank official also testified it did not matter to the bank how the money was used. This testimony supports the claim that Kroh did not make statements with the intent to influence the bank's decision about the loans by promising that the loans would be used only for personal investment with Herb Allen.

Norbank and Firstate were told the loans were for investment in the Hall Farm project. John and George were limited partners in this commercial-retail development with the Hall family. KBDC was the general contractor for the project. As limited partners, John and George had an obligation to pay for development costs. By July, 1986, KBDC had advanced approximately $500,000 in development costs, and substantially more by the end of 1986, for which it was entitled to be reimbursed by the limited partners. Thus, John Kroh argued that the turning over to KBDC of loan proceeds was literally a true statement since John and George owed the company money for this project.

John Kroh also claimed the government did not prove he made a false "statement" by submitting to Norbank his wife's guaranty with his secretary's signature. There was testimony that it was standard practice for the secretary to sign Mary Lou Kroh's name, and that his wife had previously acquiesced in this practice. The defendant contended that in light of this evidence of authority to sign, he could not be convicted for making a false statement since the statement made, his wife's signature, was authorized. This claim of authority to sign, if believed, supports Kroh's contention that the statement was not made with the intent to influence the bank's decision.

John Kroh's credibility was therefore crucial to deciding all thirteen counts, and nothing could have been more unfairly prejudicial to him than George Kroh's accusatory guilty plea that he had conspired with John to commit the bank fraud in question. When the defendant's credibility is such a vital issue, as in this case, I do not believe the trial judge's cautionary instruction diminishes the prejudicial impact of the erroneously admitted plea. *See United States v. St. Clair*, 855 F.2d 518, 523 (8th Cir.1988) (since credibility was critical to outcome, cautionary instructions insufficient to erase prejudice from minds of jurors); *United States v. American Grain & Related Indus.*, 763 F.2d 312, 319–20 (8th Cir.1985) (prejudicial impact of erroneously admitted evidence not harmless error).

---

8. For a more detailed background of the financial transactions underlying the charges in this case, *see* the panel opinion, 896 F.2d 1524, 1526–28 (8th Cir.1990).

9. For example, John Kroh's house was listed as an asset, but the outstanding mortgage was simply identified in the asset section without being included in the liability calculation. Kroh also points out that his assets and net worth were severely undercalculated. This claim is supported by the financial statements prepared for estate planning purposes by an outside-the-company CPA.

CONCLUSION

George Kroh did not prepare financial statements; all figures were filled in by John Kroh and their associate Mondschein, who directed the financial affairs. The evidence is undisputed that George Kroh, upon finding out about the check kiting scheme of Mondschein with the Bank of Commerce, denounced the plan and stated unequivocally he wanted no part of it. With his guilty plea, obviously made to avoid other felony charges, George made his own bed and has to lie in it. But the fact remains that at John Kroh's trial the government produced no evidence of a conspiracy between the two brothers. The only means to show the conspiracy was to place George's guilty plea, as a co-conspirator, before the jury. Once questioning about that plea was allowed, the whole trial became tainted.

John Kroh did not get a fair trial. This dissent is written vigorously with the hope that trial judges exercise great care and oversight when the government attempts to use guilty pleas of co-conspirators. Each case must turn on its own facts. When, however, the government's obvious purpose in calling a co-conspirator is not to adduce necessary evidence but simply to introduce a guilty plea which directly implicates a defendant, the plea should be excluded. Obviously, if the defendant preliminarily reveals to the court that he or she will attempt to impeach a co-conspirator by use of the guilty plea, then the government may use the plea in anticipating such impeachment. Trial courts, however, should make a thorough analysis of the situation and not rely on cautionary instructions alone. Notwithstanding the result in this case, trial judges still retain the obligation to provide fair trials free of the unfair prejudice that occurred in this case. The need for a fair trial should always be paramount to the government's quest to obtain a conviction at any cost.